STATE of Wisconsin, Plaintiff-Respondent and Cross-Petitioner,

v.

Richard Dean SUGDEN, Jr., Defendant-Appellant.

Supreme Court

*No. 86–0638–CR. Argued December 2, 1987.—Decided May 4, 1988.*

(Also reported in 422 N.W.2d 624.)

728

For the plaintiff-respondent and cross-petitioner the cause was argued by *Barry M. Levenson,* assistant attorney general, with whom on the briefs was *Donald J. Hanaway,* attorney general.

For the defendant-appellant there was a brief by *Michael J. Bauer* and *Hopp, Hodson, Powell & Raftery,* Sheboygan and oral argument by *Michael J. Bauer.*

HEFFERNAN, CHIEF JUSTICE. This is a review of the part of the decision[1] of the court of appeals which reversed a judgment of the circuit court for Sheboygan county, John Bolgert, circuit judge, convicting Richard Dean Sugden, Jr. (Sugden), of escape, contrary to sec. 946.42(3)(a), Stats. We reverse the decision of the court of appeals.

The issue presented here is whether the word, "custody," as used in the escape statute pertains only to the general geographical boundary of a particular state penal institution or pertains also to secure custodial facilities that are located within such an institution and to which prisoners may be confined. In

---

[1]*State v. Sugden,* 137 Wis. 2d 367, 404 N.W.2d 126 (Ct. App. 1987). We denied Sugden's petition for review of the decision of the court of appeals affirming his convictions for hostage taking and operating a motor vehicle without the owner's consent. We review only the reversal of Sugden's conviction for escape, as raised by the state's petition for cross-review.

729

this case the question is: Did Sugden escape the custody of the institution when he left the locked cottage in which he was confined according to the rules of the institution or could he escape custody of the institution only by progressing beyond the outer perimeter or fence defining the institution's outer boundaries.

We conclude that Sugden's escape from the custody in which the institution (Kettle Moraine Correctional Institution) had placed him by confining him to a secured-locked cottage constituted a completed escape from "custody of an institution." To commit the completed crime of escape from the custody of an institution it is not always necessary to progress beyond the outer perimeter of the institution's walls. In this case it was not necessary.

The statute under which Sugden was charged provides in part:

> "946.42(3) Any person in custody under any of the following circumstances who intentionally escapes from custody is guilty of a Class D felony:
> "(a)   Sentenced to a state prison.
> " . . .
> "(5)   In this section:
> "(a)   'Custody' includes without limitation actual custody of an institution, including a secured juvenile correctional facility, a secure detention facility, as defined under s. 48.02(16), or a juvenile portion of a county jail, or of a peace officer or institution guard and constructive custody of prisoners and juveniles subject to an order under s. 48.34(4m) temporarily outside the institution whether for the purpose of work, school, medical care, a leave granted under s. 56.068, a temporary leave or furlough granted to a juvenile or otherwise. . . .

"(b) 'Escape' means to leave in any manner without lawful permission or authority."

The facts are not in dispute. Sugden had been serving multiple felony sentences aggregating twenty-seven years at Waupun State Prison when he was transferred to the Kettle Moraine Correctional Institution (KMCI) on July 3, 1984. The escape from custody took place on July 8, 1984.

In accordance with the regulations of the KMCI, new transferees such as Sugden were confined in a locked separate building, the Wisconsin Cottage, until such time as, in the discretion of the prison authorities, following an evaluation and indoctrination period, they were assigned to quarters with the general prison population.

KMCI consists of numerous buildings with various security classifications. KMCI is surrounded by a double fence. According to the testimony, the distance between the fences is approximately 50 feet. That area, between the fences, is referred to as the "sally port." This area was used as a holding area for vehicles intending to enter the institution grounds. Several witnesses testified that the sally port area was considered to be outside the boundary of the institution.

In the early morning hours of July 8, while locked in the Wisconsin Cottage, the secure detention facility for new arrivees, Sugden feigned illness. The guard in charge of the facility called Lieutenant Scott, her supervisor, to talk to Sugden and to determine whether he needed emergency medical attention. Lieutenant Scott arrived in a station wagon, which he parked about 20 feet from the entrance to the cottage. He unlocked the door to the cottage and relocked it when

he went in. While he was talking to Sugden, Lieutenant Scott and the guard, Rose Marie Manderle, were attacked and physically overpowered by Sugden and two other inmates. One of the inmates placed a scissor blade to Scott's throat and forced him to unlock the exterior door. In the course of the struggle within the cottage, Guard Manderle's alarm radio was taken from her and placed on a table. Unbeknownst to the escapees, placing the radio in a horizontal or "dead-man's" position automatically triggered the alarm.

A general patrol guard responded to the alarm and was near the exterior door when the three inmates emerged holding Scott and Manderle as hostages. He took no overt action because he feared injury to the hostages. Manderle managed to strike Sugden in the ribs and escaped. Scott momentarily eluded his captors but was recaptured, but only after a struggle which left him with a wound on his forehead inflicted by a scissor stab.

Using Scott's keys, one of the inmates started the station wagon, and all three of them, with Scott as a hostage, proceeded at a high speed, estimated at 50 miles per hour, for the main gate. The vehicle smashed through the gate but was up-ended in the area between the inner gate and the outer perimeter of the sally port. After gunfire from guards at watch towers near the gate, Sugden and his fellow escapees were subdued.

At trial Sugden testified in his own defense. While he stated that he did not premeditate the escape until shortly before the events described, he testified that he and one of the other inmates who took part in the venture were discussing how great it would be to be on the outside. There is no serious dispute by defense

counsel that Sugden and his co-defendants intended to escape.

The defense argument basically if that, even though the three pierced the inner perimeter fence and ended up in the sally port area, they were still in the custody of the institution, because they had not attained freedom by getting beyond the outermost fence. Hence, it is contended that, at most, there was an attempted escape.

The district attorney at trial argued, as the state does now on this review, that escape from custody was complete when the inmates broke out of Wisconsin Cottage. A perusal of the entire transcript of the trial reveals that such has consistently been the theory of the state's case. Even though there was some evidence that the three inmates had gone beyond the perimeters of the institution by entering the sally port, the prosecutor did not rely on that fact but took the position that the escape was a completed crime when Sugden and his companions left the locked cottage.

That the trial judge was of the opinion that such was the purport of the jury verdict is demonstrated in his comments on motions after verdict. He stated, "Custody consisted of detention in his locked prison cottage. His escape from that custody occurred when he forcibly left the locked cottage of KMCI and also went through the first of two fences ...." The circuit court, after the jury verdict, found the defendant guilty of escape, taking hostages, and operating a motor vehicle without the owner's consent. Upon conviction, consecutive terms of imprisonment were imposed on Sugden for each of these offenses, respectively, five years, twenty years, and two years to be served consecutively to Sugden's previous felony sentences.

Upon appeal, the court of appeals affirmed the convictions for hostage taking and operating a motor vehicle without the owner's consent. It reversed the conviction for escape on the rationale that, because the information alleged escape from an institution, and there was no proof of progression beyond the institution grounds, the proof was insufficient. Basically, it held that, as a matter of law, escape could be a completed crime only if the inmate left the outer boundary of an institution.

██

Initially we conclude that the court of appeals misstated the crime charged in the information. The information did not charge escape from an institution. Rather, it charged, as was proper under the statute, escape from custody. The information in part charged:

> "... having ... been duly transferred ... to the Kettle Moraine Correctional Institution, did feloniously and intentionally escape from said custody, contrary to section 946.42(3)(a) ...."[2]

Thus, contrary to the statement of the court of appeals, Sugden was charged not for the escape from the institution, but from custody of the institution. We believe this semantic difference signals a real and significant difference in the legislature's characterization of the nature of the crime.

Section 946.42(3), Stats., states the crime consists of an "escape from custody" by one who is sentenced to a state prison. It is not disputed that, for the purposes of this statute, KMCI is a state prison.

---

[2]The basic crime of escape stated in sec. 946.42(3) is simply escape "from custody." Section 946.42(5)(a) is merely a partial listing of examples of different kinds of custody.

Custody is defined in sec. 946.42(3)(a), Stats., as follows: "'Custody' includes without limitation actual custody *of* an institution ...." (Emphasis supplied.) Hence, escape is not from an institution, but from the custody of that institution. Thus, it is apparent that one who escapes from a form of custody imposed violates the escape statute even though the escapee does not leave the geographical premises of the institution. "'Escape' means to leave in any manner without lawful permission or authority." Sec. 946.42(5)(b). Under this statute then, to leave custody in any manner without permission constitutes an escape.[3]

The circuit court instructed the jury with substantial correctness. It stated:

> "Now, escape from custody as defined by Wisconsin law is committed by a person who intentionally escapes from custody when the custody resulted from a sentence to a state institution. Before the defendant may be found guilty of escape from custody the state must prove by evidence which satisfies you beyond a reasonable doubt that there were present the following four elements of this offense.
>
> "First, that the defendant was in custody.
>
> "Second, that the custody was a result of being sentenced to a state correctional institution.
>
> "Third, that the defendant escaped from custody, and, fourth, that the escape from custody was intentional."

---

[3]Intent is, of course, an element of the crime. The record indisputably and inarguably demonstrates that Sugden intended to escape.

The court instructed, "Custody means the physical control of a person by an institution." We find this definition correct in that it encompasses more than just a geographical concept of a prison institution. It envisages custody as physical control of an inmate by confinement in a locked detention area within the boundaries of the institution. Accordingly, the unauthorized leaving with intent[4] constitutes an escape from custody.

We believe the court of appeals failed to give proper weight to the statutory language, escape from "custody of an institution." Instead, it equated that phrase with escape from an institution and incorrectly relied upon and used the latter phrase in its opinion. To so equate the phrases is to treat the term, "custody," as mere surplusage. It is clear that it is not, for "custody" is defined in sec. 946.42(5)(a), Stats., as having a special meaning. Thus, the analysis must be undertaken to determine the meaning of custody in the context of the facts in this case. Custody is actual custody of an institution "without limitation." Examples of custody of an institution are given in the statute. Under the statutory definition there can be custody of an institution even outside of the walls of the institution where inmates are on work details, at school, or receiving medical care, etc. Sec. 946.42(5)(a).

It is equally clear from the examples in the statute that custody of an institution may exist within

[4]At oral argument the question was posed whether an inadvertent wandering within institutional confines could subject an inmate to the sanctions of sec. 946.42. While some administrative penalties might be imposed, escape is a crime of intent, and that charge would lie only where there was evidence of intent to escape.

the perimeters of an institution because of special treatment that is given to particular inmates, *e.g.,* secured juvenile facilities, secured detention facilities, or a juvenile section of a jail.

Thus, "custody" per se of an institution is not directly related to its geographical outer boundaries. There may be custody without the walls and custody of various kinds, without limitation, within the walls. Hence, from the face of the statute as juxtaposed against the facts here, it is apparent that the locked cottage where Sugden was held constituted "custody of the institution." When he intentionally left that custody without lawful authority, his crime of escape was complete.

Had the legislature wished to convey the meaning elicited by the court of appeals, it would have used language appropriate to that meaning.

In sec. 946.74, Stats., it is made a crime to aid in the escape of a person confined for mental illness. The language used is, "Aids any person committed to an institution ... to escape therefrom." The legislature thus chose not to use the language, "escape from the custody of a mental institution." A different meaning is thus legislatively ascribed to the words. The elision of the phrase, "custody of the institution," by the court of appeals in the instant case rewrites a statute in a manner that is contrary to the expressed legislative intent.

Moreover, there was a time that the offense was characterized by the legislature not as escape from custody, but escape from prison. *See* secs. 346.40(1) and 346.44, Stats. 1925. In 1945, however, by chapter 239, the legislature adopted the language that now appears in the statute, "who shall escape ... from the ... custody of such institution." Accordingly, the progres-

sion of legislative enactments suggests that "escape from prison" means something different from "escape from custody of such institution [or prison]."

The "custody" approach to escape makes sense in terms of the policies of institutional administration. If it is appropriate in terms of correctional or penal policy to segregate some persons in locked detention facilities, it is that custody that is sought to be maintained, and it is the escape from that facility or custody that should be punished as escape. If the escape statute is interpreted to mean that the act is not complete unless the inmate goes over the outer walls, the deterrent from breaking out of secure special custody is minimized.

While some jurisdictions appear to reach conclusions at variance from ours, we note that cases brought to our attention which rely on the statutory language, "escapes from custody," conclude that the escape is complete when the inmate unlawfully removes himself from his conditions of confinement, even if the inmate does not get beyond the boundaries of the institution. *See, Scott v. State,* 672 S.W.2d 465 (Tex. Cr. App. 1984); *State v. Bryant,* 25 Wash. App. 635, 608 P.2d 1261 (1980); *Cope v. Commonwealth,* 645 S.W.2d 703 (Ky. 1983); and *People v. Quintero,* 67 Mich. App. 481, 241 N.W.2d 251 (1976). The *Quintero* case used the following language: "'[H]e escapes if he removes himself from the imposed restraint over his person and volition.'" *Id.* at 482. The concurring opinion agreed, stating, "[A] prisoner need not cross any prison boundaries before he is subject to prosecution [for escape]." *Id.* at 483. Nonetheless, the concurring judge stated there must be some indication that the prisoner "had leaving on his mind." *Id.* at 483. The *Quintero* case emphasized that the definition it uti-

lized was, as a matter of policy, "most appropriate for maintenance of proper authority and discipline by the prison officials." *Id.* at 482.

While some jurisdictions would arrive at a different conclusion, we are impelled to the one we reach by the salutary verbiage of the Wisconsin statutes, which reflects the legislature's concept of escape as being from "custody" rather than escape from the geographical boundaries of the prison as an institution.

Accordingly, we hold that it was sufficient to show that Sugden intentionally left the lawful limits of his custody in the Wisconsin Cottage with the intent to escape. Under the statutes, it is unnecessary to leave the physical boundaries of the institution to complete the act of escape. When Sugden, with his companions, overpowered the guard and supervisor and left Wisconsin Cottage, where he was confined, the criminal act of escape from custody was complete.

We reverse the court of appeals in respect to the issue raised on the state's petition for cross-review.

*By the Court.*—Decision reversed.