2000 Utah Ct. App. 022

**STATE of Utah, Plaintiff and Appellee,**

v.

**Tony R. MAESTAS, Defendant and Appellant.**

**No. 961831–CA.**

Court of Appeals of Utah.

Feb. 10, 2000.

Lynn R. Brown and Linda M. Jones, Salt Lake Legal Defender Association, Salt Lake City, for Appellant.

Jan Graham, Attorney General and J. Frederic Voros, Jr., Assistant Attorney General, Salt Lake City, for Appellee.

Before Judges BILLINGS, ORME, and WILKINS.[1]

## OPINION

ORME, Judge:

¶ 1 Defendant Tony R. Maestas appeals his convictions for drug offenses, arguing, first, that he received ineffective assistance of counsel at his jury trial, and second, that his arrest and the search that followed were illegal because Department of Corrections officers acted beyond the scope of their jurisdiction when they conducted an undercover operation outside the prison. Additionally, defendant appeals the revocation of his probation, asserting the trial court erred when it determined defendant willfully failed to comply with the terms of his probation. We conclude defendant has not met his burden on appeal and affirm.

## BACKGROUND

¶ 2 Sometime in 1992, the Department of Corrections (DOC) launched an investigation aimed at cutting off the flow of illegal drugs into the Utah State Prison. DOC officials planned an undercover sting operation and enlisted the aid of an inmate to act as a confidential informant. The informant, posing as a prisoner out on work release, was to contact individuals on the outside whom DOC officials suspected were supplying drugs to work-release inmates. Defendant was not a suspected supplier and thus not an identified target of the sting operation.

---

1. Justice Wilkins heard the arguments in this case and participated in its resolution prior to his swearing-in as a member of the Utah Supreme Court.

¶ 3 On March 14, 1992, the informant donned a "wire," and, accompanied by an undercover DOC officer, Teresa Gabaldon, set about to contact known drug dealers Patricia Chacon and Jeanette Appleman. Two other DOC officers, Kim Allen and Leo Lucey, monitored the conversations broadcast via the body wire, and observed many of the events from a surveillance van.

¶ 4 The informant and Gabaldon expressed to Appleman and Chacon their interest in purchasing illegal drugs, and the women responded by paging their supplier. The supplier still had not responded to the page, when, sometime later, Appleman and Gabaldon went to a payphone to page the supplier again. As she left, Appleman mentioned that her brother's neighbor—who happened to be none other than defendant—could get drugs for her. Appleman indicated she had no way to contact defendant, but that he frequently dropped by.

¶ 5 While Appleman and Gabaldon were gone, defendant did in fact drop by, in the company of another man. The informant told them Gabaldon and Appleman were out trying to contact their supplier because he, the informant, wanted to purchase drugs. Defendant then displayed a small bag of cocaine and said, "I have this right here." The informant bought the cocaine for $100, and defendant left the apartment.

¶ 6 The informant then came out of Appleman's apartment, got into Gabaldon's car, and gave her the cocaine he had just purchased. Armed peace officers were notified that the sale had been completed, and they stopped the car in which defendant was riding and arrested him. Incident to the arrest, one of the officers searched defendant and confiscated two separate substances, believed to be illegal drugs, and nearly $400 in cash.

¶ 7 Defendant was charged with unlawful possession of a controlled substance within 1000 feet of a public school, a first degree felony in violation of Utah Code Ann. § 58–37–8(1)(a)(ii) (Supp.1991) (currently codified at § 58–37–8(4)(a)(ix) (Supp.1999)), and possession of a controlled substance, a third degree felony in violation of Utah Code Ann. § 58–37–8(2)(a)(i) (Supp.1999). Defendant's case was tried to a jury, which found him guilty on both counts. Thereafter, defendant was sentenced to statutory prison terms and fines, but execution of the prison sentences was stayed and defendant was placed on probation and ordered to complete the Odyssey House treatment program.

¶ 8 Less than a month after his participation in the program began, defendant's probation officer filed a Progress/Violation Report informing the trial court that defendant had "become suicidal, homicidal, and had begun attacking staff and personnel at Odyssey House." The report was prompted by defendant's repeated suicidal "ideation" and a threat to assault his ex-wife. Odyssey House had warned defendant that, because it was not a psychiatric facility, defendant could not stay in the program if his suicidal inclination continued.

¶ 9 At the hearing on the order to show cause why defendant's probation should not be revoked, the trial court heard testimony that defendant was capable of following the rules of Odyssey House. The court ultimately found that defendant had violated the conditions of his probation and that his "violation was knowing and intentional under circumstances where the defendant had the ability to comply with the Court's order on the conditions of probation." Defendant's probation was revoked, and he was ordered to serve his prison sentence.

## ISSUES AND STANDARDS OF REVIEW

¶ 10 Defendant raises three main issues on appeal.[2] First, he argues he re-

---

**2.** It is noteworthy, as well as atypical, that we are deciding this appeal nearly eight years after the crime was committed. An explanation is in order.

Defendant was charged by information on March 25, 1992, and was tried and convicted by a jury on April 28, 1993. After numerous continuances, he was sentenced in December of that year. A timely notice of appeal was filed, but his appeal was dismissed when prior counsel failed to file the required brief.

Defendant's probation was revoked in September of 1994. Thereafter, in April of 1995, defendant, represented by new counsel, filed a Verified Rule 65B Petition for Relief from Conviction and Extraordinary Writ. In response, the trial court

ceived ineffective assistance of counsel in his jury trial because trial counsel failed to impeach the confidential informant's credibility. Following our temporary remand, the trial court held a hearing pursuant to Rule 23B of the Utah Rules of Appellate Procedure and made findings of fact relevant to defendant's claim. We defer to those factual findings, but determine as a matter of law "whether the defendant received ineffective assistance of counsel in violation of the Sixth Amendment." *State v. Huggins*, 920 P.2d 1195, 1198 (Utah Ct.App.), *cert. denied*, 929 P.2d 350 (Utah 1996). *See State v. Gallegos*, 967 P.2d 973, 975–76 (Utah Ct.App.1998).

¶ 11 Defendant also argues that evidence seized in the search incident to his arrest should have been suppressed because the arrest was illegal. He argues the arrest violated his Fourth Amendment rights and exceeded the scope of DOC's statutory authority. Because this issue was not raised below, defendant asserts that his trial counsel was ineffective and that the trial court committed plain error. These are questions of law, which we review nondeferentially. *See State v. Simmons*, 866 P.2d 614, 618 (Utah Ct.App.1993) ("Whether police action implicates a fundamental violation of a defendant's rights is a question of law, which we independently review for correctness."); *State v. Fixel*, 945 P.2d 149, 151 (Utah Ct.App.1997) (interpretation of statute is question of law reviewed for correctness); *Gallegos*, 967 P.2d at 975–76 (claim of ineffective assistance of counsel raised for first time on appeal presents question of law).

¶ 12 Finally, defendant argues the trial court erred when it revoked his probation, finding defendant's violation of the terms and conditions of his probation intentional and willful. The trial court's determinations underlying its conclusion that defendant violated his probation are findings of fact we will

not disturb unless clearly erroneous, i.e., against the clear weight of the evidence. *See State v. Martinez*, 811 P.2d 205, 209 (Utah Ct.App.), *cert. denied*, 815 P.2d 241 (Utah 1991). Moreover, revocation of probation is within the trial court's discretion. *See State v. Archuleta*, 812 P.2d 80, 82 (Utah Ct.App. 1991). Therefore, we view the evidence of a probation violation in a light most favorable to the trial court's findings and substitute our own judgment only if the evidence is so deficient as to render the court's action an abuse of discretion. *See State v. Peterson*, 869 P.2d 989, 991 (Utah Ct.App.1994).

## INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 13 Defendant argues he received ineffective assistance of counsel in violation of his Sixth Amendment right because his trial counsel failed to investigate and impeach the credibility of the State's key witness, the confidential informant. The trial court held a Rule 23B hearing and made specific findings of fact regarding defendant's ineffective assistance claim.

¶ 14 Specifically, the trial court found that the confidential informant had been imprisoned on multiple counts of forgery and one count of fraud, and, while serving his sentence, had been disciplined numerous times for using drugs and smuggling them into the prison. A DOC assessment described the informant as an inmate who "cannot be trusted at all." He was under investigation for drug-related activities when he was asked to participate in DOC's investigation. An agent of the Department of Adult Probation and Parole was, for obvious reasons, of the opinion that "it would not be wise to allow him to participate." Nevertheless, the informant accepted the invitation, and, although a DOC investigator testified he was promised nothing in return other than a let-

---

resentenced defendant on June 17, 1996, to allow him to pursue a direct appeal, which defendant timely did. However, nine months into the appeal, defendant filed a motion pursuant to Utah R.App. P. 23B, whereupon we remanded to the trial court for "entry of findings of fact regarding appellant's claim of ineffective assistance of his trial counsel."

An evidentiary hearing was held and the trial court entered findings in November and December of 1997, which were filed in this court in January of 1998. Briefing was stayed, however, upon defendant's motion to further supplement the record. The supplemental record was filed in November of 1998, and briefing was finally completed in May of 1999. Oral argument was held September 27, 1999.

ter recommending that he not lose his parole date despite a "dirty" urinalysis, he was paroled on April 2, 1992, less than one month after his participation in the investigation and more than nine months ahead of schedule.[3] The drug-related activities for which he was under investigation before the sting operation resulted in no prison discipline or criminal charges.

¶ 15 Defendant argues defense counsel's failure to discover these facts impugning the informant's credibility and to present them to the jury constitutes representation so deficient as to violate defendant's constitutional rights to competent representation and to confront the witnesses against him. However, in addition to showing trial counsel made serious errors abridging his Sixth Amendment rights, defendant must also show counsel's errors prejudiced him by depriving him of a fair trial and producing a verdict in which we have no confidence. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The State argues that even if counsel's performance was deficient, defendant has failed to show that trial counsel's failure to impeach the confidential informant prejudiced him. Because the informant's testimony was abundantly corroborated, we agree.

¶ 16 The informant testified as follows: On March 14, 1992, he and Gabaldon attempted to contact individuals suspected of supplying drugs to prison inmates. He entered Appleman's apartment while Gabaldon remained in the car, and eventually defendant and another man came to the apartment looking for Appleman. When defendant learned that Appleman was out trying to contact her supplier, defendant pulled out a small bag of cocaine and said, "I have this right here." Defendant then asked the informant if he was a cop, and the informant answered in the negative and told defendant he was out of prison on a home visit. Defendant's companion then left the apartment and the informant paid defendant $100 for the cocaine, whereupon the informant retired to the bathroom and told the listening agents over the wire that the transaction was complete and they should arrest "the two Mexicans that left the apartment building." At trial, the prosecutor showed the informant a bag of cocaine and the informant identified it as the same or similar to the bag he bought from defendant.

¶ 17 The key elements of the informant's testimony were corroborated by other witnesses. First, defendant admitted that he was in Appleman's apartment that day. Further, Officer Leo Lucey, who was in charge of the investigation, testified that while monitoring the informant's "wire," he heard someone ask the informant what kind of drugs he wanted, followed by a discussion about money and the informant's report that the transaction was complete. Similarly, Officer Kim Allen, who was watching through a telescope, testified he saw two men who appeared to be Hispanic go into the apartment. Like Lucey, he heard discussion over the wire concerning the purchase of drugs and the amount to be paid. He testified he heard a nervous person ask the informant if he was a cop and the informant reply that he was out of prison on a release program. He also testified that one of the two Hispanic men left the apartment, and, thereafter, the informant stated over the wire that the transaction was com-

---

3. In connection with this fact, defendant alleges prosecutorial misconduct, arguing the prosecutor left the jury with the impression that the informant had been an inmate in the Utah State Prison continuously from the time of his participation in the undercover operation through the time of trial. In reality, the informant was released shortly after the investigation and, by the time of trial, was again incarcerated on new charges. Defendant argues the prosecutor's questioning was improper because it concealed the fact that the informant was paroled early, possibly as a reward for his role in the investigation. We do not agree that the prosecutor's questioning of the informant rose to the level of presenting false evidence and decline to address this argument further. *See State v. Carter*, 776 P.2d 886, 888 (Utah 1989) (holding that appellate court "need not analyze and address in writing each and every argument, issue, or claim raised and properly before us on appeal"). *See also id.* ("[I]t is a maxim of appellate review that the nature and extent of an opinion rendered by an appellate court is largely discretionary with that court."). *Cf. Reese v. Reese*, 984 P.2d 987, 991 (Utah 1999) (to facilitate Supreme Court certiorari review, court of appeals must "at the very least identif[y] the basis for refusing to treat an issue").

plete and described defendant and his car. Sure enough, when the car was stopped, defendant had drugs and a considerable cash sum on his person.

¶ 18 Gabaldon's testimony even more convincingly corroborated the informant's version of events. She testified that when she and Appleman returned in the car from their attempt to contact Appleman's regular supplier from a payphone at a nearby convenience store, they saw defendant and his companion outside standing by a car. When Appleman saw the two men, she told Gabaldon, "Well, there they are now.... I know I can get some stuff from them." Appleman got out of the car and approached defendant and his companion, while Gabaldon turned the car around. Appleman then came back to the car, gestured toward defendant, and said, "Well, he already sold him cocaine." [4] In addition, both Gabaldon and Officer Jeff Sundquist identified the bag of cocaine.

¶ 19 We agree with the State that, even had the jury been apprised of the facts bearing on the informant's credibility, it would not have altogether disregarded his testimony because it was corroborated by the testimony of other witnesses. The failure of defendant's trial counsel to impeach the informant's credibility, then, does not undermine our confidence in defendant's convictions. Having failed to show that the errors of his trial counsel resulted in prejudice, defendant's ineffective assistance of counsel claim fails.

## PROPRIETY OF THE DOC INVESTIGATION

¶ 20 We turn now to defendant's challenge to DOC's authority to conduct the sting operation in which he was ensnared. Defendant argues DOC lacked authority to conduct undercover investigations outside the prison, and, in any event, should have looked the other way when defendant happened onto the scene because defendant was not on the list of suspects targeted by the investigation. He argues his arrest was illegal and that the drugs and money seized in the search inci-

dent to the arrest should have been suppressed. Because these arguments were not raised at trial, defendant argues that his trial counsel provided ineffective assistance of counsel and that the trial court committed plain error when it did not exclude the evidence sua sponte. We disagree.

¶ 21 DOC may "designate by policy which of its employees have the authority and powers of peace officers, the power to administer oaths, and other powers the department considers appropriate, including but not limited to the responsibility to bear firearms." Utah Code Ann. § 64–13–8 (1996). In 1992, DOC-designated peace officers, as state employees, had statewide peace officer authority. *See* 1987 Utah Laws ch. 69, § 9 ("Peace officers have statewide peace officer authority, but the authority extends to other counties, cities, or towns only when they are acting under Chapter 9, Title 77[, i.e., are in fresh pursuit.] This limitation does not apply to any peace officer employed by the state."). It is undisputed that the DOC officers conducting the investigation in question were certified peace officers employed by a state agency. Given DOC's broad statutory license under section 64–13–8 to define the duties of its peace officers, and under the jurisdictional statute then in effect, which placed no intrastate geographic restrictions on DOC peace officer authority, the officers in this case acted within the scope of their authority in pursuing the undercover investigation. Further, their authority was not somehow limited by their predetermined suspect list. When defendant walked into their trap, they had every right to adjust the focus of the investigation to account for such fortuity. Defendant was not prejudiced by his trial counsel's failure to raise these issues at trial, nor did the trial court commit error, plain or otherwise, in this regard.

## PROBATION REVOCATION

¶ 22 Finally, we address defendant's challenge to the trial court's determination that he violated the terms and conditions of his

---

4. Counsel's failure to object to this testimony as hearsay was itself claimed to be ineffective assistance of counsel, but defendant did not raise this argument until his reply brief, which is too late. *See Burgandy v. State*, 983 P.2d 586, 588 n. 1 (Utah Ct.App.1999); Utah R.App. P. 24(c).

probation by "knowing[ly] and intentional[ly]" failing to comply with Odyssey House rules. Defendant had been told that Odyssey House was not a psychiatric facility and could not treat suicidal depression. He knew that he could not remain in the program if he continued to express suicidal thoughts. Nevertheless, defendant argues his failure to comply with this standard was not knowing and intentional, but was the product of mental illness. The trial court disagreed, finding that defendant was capable of controlling his suicidal thoughts and behavior and that his probation violation was, accordingly, knowing and intentional. Defendant argues this finding is clearly erroneous.

¶ 23 A court may revoke probation if, upon "balanc[ing] the evidence, using discretion to weigh its importance and credibility, [it determines that] the probationer has more likely than not violated the conditions of probation." *State v. Hodges,* 798 P.2d 270, 279 (Utah Ct.App.1990). We will not disturb the trial court's decision unless the court's findings are against the clear weight of the evidence and the probation revocation was an abuse of discretion. *See State v. Peterson,* 869 P.2d 989, 991 (Utah Ct.App.1994); *State v. Martinez,* 811 P.2d 205, 208–09 (Utah Ct.App.), *cert. denied,* 815 P.2d 241 (Utah 1991). Moreover, we review the evidence before the court in a light favorable to the court's findings. *See Peterson,* 869 P.2d at 991; *Martinez,* 811 P.2d at 208.

¶ 24 This court has previously held that "in order for a trial court to revoke probation based on a probation violation, the court must determine by a preponderance of the evidence that the violation was willful." *Peterson,* 869 P.2d at 991. *Accord Hodges,* 798 P.2d at 277. However, "willful" in this context does not mean "intentional." *Peterson,* 869 P.2d at 991. "[A] finding of willfulness 'merely requires a finding that the probationer did not make *bona fide* efforts to meet the conditions of his probation.'" *Id.* (quoting *State v. Archuleta,* 812 P.2d 80, 84 (Utah Ct.App.1991)).

¶ 25 At defendant's revocation hearing, the clinical director of Odyssey House testified that defendant was capable of complying with the rules of the program. Similarly, a program counselor testified that

defendant's suicidal "ideation" began as manipulative behavior that escalated into a frenzy. Based on the evidence before it, the trial court found a violation of probation "[t]hat ... was knowing and intentional under circumstances where the defendant had the ability to comply with the Court's order." Defendant presented no evidence whatsoever on his own behalf. The testimony of the Odyssey House clinicians concerning defendant's ability to control his suicidal "ideation" was uncontroverted, and is sufficient to support the trial court's finding of a probation violation. The court did not abuse its discretion when it revoked defendant's probation.

## CONCLUSION

¶ 26 We reject defendant's claims of error. Defendant was not prejudiced by his trial counsel's failure to impeach the confidential informant. DOC did not exceed the scope of its statutory authority when it conducted the investigation outside the prison. The trial court properly revoked defendant's probation based on findings adequately supported by the evidence.

¶ 27 Affirmed.

¶ 28 WE CONCUR: JUDITH M. BILLINGS, Judge and MICHAEL J. WILKINS, Judge.

