2003 UT App 217

**STATE of Utah, Plaintiff and Appellee,**

**v.**

**Frederick GERMONTO, Defendant and Appellant.**

No. 20020304–CA.

Court of Appeals of Utah.

June 26, 2003.

Joan C. Watt, Salt Lake City, for Appellant.

Mark L. Shurtleff and J. Frederic Voros Jr., Asst.Atty. Gen., Salt Lake City, for Appellee.

Before JACKSON, P.J., DAVIS, and THORNE, JJ.

## OPINION

JACKSON, Presiding Judge:

¶ 1 Frederick Germonto appeals from a conviction for escape from official custody, a second degree felony, in violation of Utah Code Annotated Section 76–8–309 (1999) (escape statute). We reverse.

## BACKGROUND

¶ 2 On February 5, 2000, Germonto, an inmate at the Utah State Prison, attended chapel with a group of other inmates. While walking from the prison chapel back to his housing unit, Germonto broke rank and scaled a ten-foot chain link fence that separated the inmate housing yard from the outer perimeter area of the prison. He then proceeded to scale the perimeter fence, which had razor wire at the top. Prison guards arrived and ordered Germonto off the fence. Germonto dropped from the fence back onto the prison grounds, ran parallel to the perimeter fence, then stopped and was taken back into custody.

¶ 3 On March 9, 2000, the State filed an Information charging Germonto with violating the escape statute. A preliminary hearing was held before the Third District Court on August 17, 2000, at which Germonto argued that he could not be bound over on the crime of escape because he had not left the confines of the prison and therefore had not actually completed an escape.

¶ 4 The district court judge, acting as a magistrate, rejected Germonto's arguments and bound Germonto over for trial on the charge of escape. Germonto filed a pro se motion to quash the bindover, which was denied. His case was then transferred to a judge in West Valley City, and Germonto renewed his motion to dismiss. Germonto also challenged the State's ability to request a lesser included offense instruction of attempted escape when it was proceeding on the escape charge based on an incomplete escape.

¶ 5 On March 19, 2002, Germonto entered a conditional plea of no contest, expressly reserving his right to appeal the adverse rulings regarding the propriety of the bindover. This appeal followed.

## ISSUE AND STANDARD OF REVIEW

¶ 6 Germonto challenges the sufficiency of the evidence to support a bindover on the charge of escape. To support a bindover, the State must introduce "sufficient evidence to support a reasonable belief that an offense has been committed and that the defendant committed it." *State v. Clark,* 2001 UT 9,¶ 16, 20 P.3d 300. This requires the State to present believable evidence as to each of elements of the crime. *See id.* at ¶ 13. To determine the elements of the crime, the court must interpret the statute under which the defendant is charged. Statutory interpretation is a matter of law, which we review for correctness. *See State v. Maestas,* 2000 UT App 22,¶ 11, 997 P.2d 314.

## ANALYSIS

¶ 7 In interpreting statutes, we first look to the plain language of the statute. *See Travelers/Aetna Ins. Co. v. Wilson,* 2002 UT App 221,¶ 12, 51 P.3d 1288. In considering the plain language of a statute, courts " 'presume that the legislature used each word advisedly and give effect to each term according to its ordinary and accepted meaning.' " *Arredondo v. Avis Rent A Car Sys., Inc.,* 2001 UT 29,¶ 12, 24 P.3d 928 (citations omitted). We consider other methods of statutory construction only when a statute is ambiguous.[1]

1. Even in construing ambiguous statutes, our

focus remains on effectuating the legislative in-

¶ 8 The plain language of Utah's escape statute requires that an inmate leave the confines of the prison to be guilty of escape. The escape statute plainly states that "[a] prisoner is guilty of escape if he leaves official custody without authorization." Utah Code Ann. § 76–8–309(1). Subsection (7)(b) defines "official custody" as "confinement in the state prison" for purposes of this case.[2] Subsection (7)(a) further defines "confinement" as "housed in a state prison." *Id.* § 76–8–309(7)(a)(i). Thus, to be guilty of escape, an inmate must leave his confinement or housing in the prison.

¶ 9 The term "housing" is not defined in Utah's escape statute. The State argues, and the trial court agreed, that we should construe the term to include only the authorized areas of the prison. According to this definition, Germonto completed an escape because he stepped out of the queue of inmates without authorization. Germonto argues that we should construe the term to include the "confines of the prison," or the perimeter fence and all areas of the prison within the fence. We are persuaded that Germonto's construction of the term "housing" better accords with the legislative intent of the statute.

¶ 10 Although decisions from other jurisdictions interpreting statutes with distinct language provide little guidance in interpreting the language of Utah's escape statute, the decision in *State v. Gaines*, 372 So.2d 552 (La.1979) is worth noting because the statute

at issue in that case is similar to Utah's escape statute. The statute at issue in *Gaines* defined escape as "the intentional departure ... of a person imprisoned, committed, detained, or otherwise in the lawful custody of any law enforcement officer ... *from any place where such person is lawfully confined.*" *Id.* at 554 (quoting La. R.S. 14:110(A)) (emphasis added). The court concluded that "any place where [a person is] legally confined" must necessarily be a place with physical barriers where the person is actually confined. *Id.* at 555. In reaching that determination, the court recognized that "[a]ny less definitive or more ambiguous definition of place of confinement would render the statute unconstitutionally vague." *Id.* In addition, the court recognized that even if the language were ambiguous, any ambiguity must be resolved in favor of the defendant. *See id.* at 554. Because Gaines departed from an okra patch on prison grounds where he was on work detail but did not otherwise leave the confinement or boundaries of the prison, the court held that he did not commit an escape when he ran from the line where he was working and continued running even after a guard told him to stop and fired warning shots. *See id.* at 553–54.

¶ 11 Like the statute in *Gaines*, if Utah's escape statute were interpreted to allow a conviction for escape when an inmate has not left the confines of the prison, the statute would be void for vagueness. A stat-

---

tent. *See Intermountain Slurry Seal v. Labor Comm'n*, 2002 UT App 164,¶ 6, 48 P.3d 252 ("When doubt or uncertainty exists as to the meaning or application of an act's provisions, an analysis of the act in its entirety should be undertaken and its provisions harmonized in accordance with the legislative intent and purpose.").

2.  Subsection (7)(b) reads in full:
    "Official custody" means arrest, whether with or without warrant, or *confinement in a state prison*, jail, institution for secure confinement of juvenile offenders, or any confinement pursuant to an order of the court or sentenced and committed and the sentence has not been terminated or voided or the prisoner is not on parole. A person is considered confined in the state prison if he:
    (i) without authority fails to return to his place of confinement from work release or home visit by the time designated for return;

(ii) is in prehearing custody after arrest for parole violation;
(iii) is being housed in a county jail, after felony commitment, pursuant to a contract with the Department of Corrections; or
(iv) is being transported as a prisoner in the state prison by correctional officers.
Utah Code Ann. § 76–8–309(7)(b) (emphasis added). The last sentence of subsection (7)(b) clarifies that a person can be in "official custody" and therefore can be charged with escape even if he is not actually being held in the prison on a felony commitment. *Id.* Instead, a person is in "official custody" if he is on work release, being held on a parole violation, being held at a county jail on a prison commitment, or being transported to court, the hospital or elsewhere. *Id.* § 76–8–309(7)(i)–(iii). None of these circumstances, however, apply to Germonto. Germonto was in "official custody" due to his "confinement in the state prison." *Id.* § 76–8–309(7)(b).

ute is unconstitutionally vague if it: (1) fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited."; (2) "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application"; or (3) inhibits the exercise of First Amendment freedoms. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972). If we interpreted the statute so that an escape occurs even though the inmate has not left the official custody or confinement of the prison, the statute would violate the first two of these prohibitions.

¶ 12 First, a person of ordinary intelligence would not have notice as to what conduct is prohibited. The statute itself defines "official custody" as confinement in the state prison, and defines "confinement" as "housed in the state prison." While the statute defines the term "confinement," that term also has an ordinary and commonly understood meaning that is consistent with the statutory definition. "Confinement" means imprisonment or being confined, i.e., being held within a boundary or bounded region. Webster's New World College Dictionary 306 (4th ed.1999). A person of ordinary intelligence could not read the escape statute and be given notice that he would be guilty of a completed escape even if he did not leave the confines of the prison.

¶ 13 Second, if we interpreted the statute to allow a completed escape even though Germonto did not leave the prison grounds, we would leave prison guards, judges, and juries to decide whether an escape occurred any time an inmate entered a restricted area or even left his cell when he was not supposed to do so. The escape statute would be enforced arbitrarily to convict some inmates who venture out of their cells while subjecting others only to administrative sanctions based on the whim of the guards and not on legislative mandate.

¶ 14 In order to "save [the statute] from constitutional conflicts or infirmities," *Intermountain Slurry Seal v. Labor Commission*, 2002 UT App 164,¶ 6, 48 P.3d 252, the trial court's interpretation must be rejected. Instead, we must uphold the plain language of the statute, which requires an inmate to leave the confinement of the prison in order to commit an escape.

¶ 15 Our decision is bolstered by the portion of the code that outlines the elements for attempt crimes. *See* Utah Code Ann. § 76–4–101 (1999). "[A] person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for the commission of the offense, he engages in conduct constituting a substantial step toward the commission of the offense." *Id.* The attempt statute further requires that any conduct be "strongly corroborative of the actor's intent to commit the offense" to constitute a "substantial step." *Id.*

¶ 16 We would eviscerate the crime of attempted escape if we considered any conduct by an inmate who moves to an area on prison grounds that is restricted or in which he is not supposed to be a completed escape. Any time an inmate is out of his cell when he is not supposed to be, fails to awake and vacate his cell when he is supposed to do so, is in the cell of another inmate, disregards the order of a guard, or otherwise moves out of bounds, the state could charge the inmate with a completed escape. Such an approach would run contrary to the legislative intent that an inmate leave official custody by leaving the confinement of the prison in order to commit a completed escape, and would do away with the crime of attempted escape.

¶ 17 The trial court's interpretation also disregards the purposes and principles set forth in Utah Code Ann. § 76–1–104 (1999), which requires that the provisions of the code be interpreted so that the elements of a crime are clearly defined, the penalties are proportionate to the seriousness of the offense, and arbitrary or oppressive treatment is prevented. The trial court's interpretation would allow for a punishment that is disproportionate to the crime because an inmate who did not leave the confinement of the prison would receive the same second degree felony punishment as an inmate who did leave the prison.

¶ 18 Finally, the prison has administrative rules for internally punishing inmates who move into restricted areas. When an inmate leaves his or her assigned area, the prison has the ability to impose sanctions. Leaving the assigned area is not the same as "leaving official custody" and is appropriately punished internally by restricting the inmate's privileges, transferring the inmate to a more secure location, requiring that the inmate be locked down for a significant portion of the day, or imposing other appropriate internal sanctions. *See, e.g., People v. Lavaie,* 70 Cal.App.4th 456, 462, 82 Cal.Rptr.2d 719 (1999) (determining that an inmate was subject to disciplinary rules but was not guilty of escape where guards saw two men walking toward the gate at 1:00 a.m., and where the defendant was missing from bed count but was later found within a restricted area of the prison); *State v. Liggett,* 363 So.2d 1184, 1186 (La.1978) (concluding that an inmate who did not report for work and who was later found in another section of the prison was subject to prison disciplinary rules but did not commit the crime of escape).

## CONCLUSION

¶ 19 In this case, there was not probable cause to believe Germonto completed the crime of escape because there is no evidence that he left the confines of the prison. While the evidence demonstrated that Germonto climbed over the inner fence, there is no evidence that he made it over the outer boundary fence and left the prison. Although the State presented sufficient evidence to bind Germonto over on the charge of attempted escape, it failed to establish probable cause to bind Germonto over on the crime of escape. Accordingly, the trial court erred in refusing to quash the bindover on that charge. We now reverse and remand for withdrawal of the conditional plea.

¶ 20 I CONCUR: JAMES Z. DAVIS, Judge.

THORNE, Judge (dissenting):

¶ 21 Because I believe the majority interpretation of Utah Code Annotated section 76–8–309 (1999) is flawed, I respectfully dissent.

¶ 22 The majority concludes that under the plain language of our escape statute, an escape is not accomplished absent a prisoner successfully leaving the prison. The majority relies upon *State v. Gaines,* 372 So.2d 552 (La.1979), to support this position. However, because the Louisiana escape statute is materially different from our own, the majority's reliance on *Gaines* is misplaced. In *Gaines,* the Louisiana Supreme Court examined whether a prisoner who fled from his assigned area within the prison, with the intent to leave the prison, had violated Louisiana's escape statute. *See id.* at 553–54. The court examined the plain language of the Louisiana statute and determined that the legislature had amended the escape statute to require specific proof of two distinct elements: (1) The prisoner must escape from official custody; and (2) the prisoner must escape from a place of legal confinement.[1] *See id.* at 554. Having so interpreted the statute, the Louisiana Supreme Court reversed Gaines's conviction, because while he escaped from official custody, at no point did he actually leave prison grounds. *See id.* at 555.

¶ 23 In contrast, our escape statute, section 76–8–309, states that "[a] prisoner is guilty of escape if he leaves official custody without authorization." Utah Code Ann. § 76–8–309(1). Thus, unlike the statute at issue in *Gaines,* in Utah, an escape is complete once a prisoner "leaves official custody [making no reference to geographic boundaries] without authorization." *Id.* § 76–8–309(1). Accordingly, it is clear that our legislature has not seen fit to require the state to prove two conjunctive elements to establish that the crime of escape has been commit-

---

1. During the relevant period, Louisiana's escape statute read as follows:

   Simple escape is: .... The intentional departure, under circumstances wherein human life is not endangered, of a person imprisoned, committed, detained, or otherwise in the law-ful custody of any law enforcement officer or officer of the Department of Corrections, from any place where such person is legally confined.

   *State v. Gaines,* 372 So.2d 552, 554 (La.1978) (quotations and citation omitted).

ted.[2] I therefore cannot join in the majority view that the analysis offered in *Gaines* provides constructive assistance in the present case.

¶ 24 Instead, I believe that 79 A.L.R.4th 1060, Annotation *Convictions For Escape Where Prisoner Fails to Leave Confines of Prison or Institution* (1990 & Supp.2002), is much more helpful in analyzing this situation. Specifically, 79 A.L.R.4th 1060 presents a myriad of case law that directly supports my interpretation of section 76–8–309. Among these cases, I find *Huffman v. State*, 659 N.E.2d 214 (Ind.Ct.App.1995),[3] to be particularly instructive. In *Huffman*, the defendant was a prisoner who had left his dormitory without authorization and hid on prison grounds until he was later discovered. *See id.* at 215. Subsequently, the defendant was convicted of escape. *See id.* On appeal, the defendant argued that "he could not properly be convicted of Escape because he had not made it off" prison grounds. *Id.* In denying his claim, the Indiana Court of Appeals noted

that our sister states have almost universally upheld Escape convictions where the prisoner did not make it outside the prison or detention facility where the states' statutes involved proscribed "escape from 'custody,' 'confinement,' or the like" (as opposed to statutes which proscribed "escape from 'prison,' 'detention facility,' or the like") and the prisoner exhibited an intention to leave the confines of the prison or institution.

*Id.* (citations omitted).

¶ 25 Similarly, in *Urbauer v. State*, 744 P.2d 1274 (Okla.Crim.App.1987), the defendant was convicted of escape after scaling two of three fences surrounding the prison where he was incarcerated. *See id.* at 1275. On appeal the defendant argued that the evidence was insufficient to prove escape because he had not succeeded in leaving the prison grounds. *See id.* The court, in denying his claim, noted that "[w]e think that for purposes of escape from a penal institution, 'custody' may be restraint by either physical means or by a superior force acting as a moral restraint. But there must be actual or constructive custody in order to escape from that custody." *Id.* The court further stated that "[a]ny departure from such restraint or control, with or without force, whether from custody of an officer or from *any place* where one is lawfully confined may be adjudged an escape." *Id.*

¶ 26 Finally, in *State v. Sugden*, 143 Wis.2d 728, 422 N.W.2d 624 (1988), the defendant was convicted of escape after highjacking a prison vehicle and driving it through the inner wall only to be stopped before reaching the outer wall. *See id.* at 625–26. At trial, and on appeal, the state argued that the defendant's escape was complete when he broke out of the housing facility within the prison and that the defendant's point of capture was immaterial. *See id.* at 626. The Wisconsin Supreme Court agreed, stating that within the meaning of the Wisconsin escape statute, "custody of an institution may exist within the perimeters of an institution because of special treatment that is given to particular inmates." *Id.* at 627. Thus, the court concluded, "[t]here may be custody without the walls and custody of various kinds, without limitation, within the walls." *Id.* at 627;[4] *see also* Annotation *Conviction*

2. Admittedly, Utah Code Annotated section 76–8–309 (1999) offers a number of definitions for the term "official custody." I believe, however, that the broad range provided supports, rather than undermines, my conclusion. The definitions offered range from simple arrest, which can occur on the street and which is technically complete once a person is informed of the fact, with or without handcuffs or other restraining devices, to "confinement in a state prison, jail" or other area of secure confinement. *Id.* § 76–8–309(7)(b). Thus, unlike the majority, I do not believe the definitions offered create additional elements that must be proved by the state. Rather, I believe the definitions merely highlight those individuals who are subject to prosecution

under section 76–8–309 should they "leave[ ] official custody without authorization." *Id.* § 76–8–309(1).

3. The Indiana escape statute in effect at the time of Huffman's action defined escape as follows: "A person who intentionally flees from lawful detention commits escape ...." *Huffman v. State*, 659 N.E.2d 214, 215 (Ind.Ct.App.1995) (quoting Ind.Code § 35–44–3–5(a)).

4. The Wisconsin court also noted that " 'escape from prison' means something different from 'escape from custody of such institution [or prison].' " *State v. Sugden*, 143 Wis.2d 728, 422

*For Escape Where Prisoner Fails to Leave Confines of Prison of Institution,* 79 A.L.R.4th 1060 (1990 & Supp.2002) ("As a general matter, it has been held that the crime of escape may be complete, notwithstanding the fact that the prisoner does not depart from the enclosure of the prison, if he succeeds in leaving his cell, where the statute penalizes an escape from 'any place whatsoever' in which the prisoner is placed.").

¶ 27 Much like the statutes at issue in *Sugden* and *Urbauer,* Utah's escape statute criminalizes "leav[ing] official custody without authorization." Utah Code Ann. § 76–8–309(1). Thus, because "[t]here may be custody without walls and custody of various kinds, without limitation, within the walls," *Sugden,* 422 N.W.2d at 627; *see also* Utah Code Ann. § 76–8–309(7)(b) (defining the broad meaning of "official custody" under the statute), I would conclude that Germonto left official custody when he left his authorized area of confinement. It is clear from the record that Germonto's authorized area of confinement at the time of his escape was comprised of the yard through which he was traveling, following a church service, to return to his cell, and that when he scaled the fence into the "no-man's-land" area between the fences he had left official custody without authorization. *See State v. Descoteaux,* 94 Wash.2d 31, 614 P.2d 179, 181 (1980) ("[D]efendant could be convicted of escape if he knew his actions would result in leaving confinement without permission."), *modified by State v. Danforth,* 97 Wash.2d 255, 643 P.2d 882 (1982).

¶ 28 Moreover, inserting the definitions for "official custody" and "confinement" supplied in section 76–8–309(7)(a), (b), does not require a different result in this case. The application of the provided definitions

changes the statute to read that Germonto is guilty of escape if he leaves "confinement in a state prison," where he is housed, without authorization. Utah Code Ann. § 76–8–309(7)(a)–(b).[5] At the time of his escape, Germonto was "confined" to an area within the prison, bounded by a substantial fence, through which the guards transported the prisoners to and from the chapel. It was from this area of confinement within the prison that Germonto left without authorization when he successfully scaled the inner fence, knowing that if left unchecked he would reach "freedom." Thus, even considering the definitions provided for within the statute, Germonto's actions violated section 76–8–309. *See also Fitzgerald v. State,* 782 S.W.2d 876, 879 (Tex.Crim.App.1990) (concluding that defendant had escaped from custody when he left specific housing unit within the prison to which he was confined).

¶ 29 While it is possible to read into section 76–8–309 the implied requirement that to be convicted of the crime of escape a prisoner must successfully escape all boundaries of the prison in which he finds himself, I believe that had the legislature intended that effect it could have, and would have, clearly communicated that intent in the statutory language. Instead, the legislature chose to criminalize the act of leaving official custody without authorization, an act that is accomplished not by escaping from the geographic boundaries of an institution, but by escaping from the authorized presence and immediate control of the institution or an arresting officer. *See Sugden,* 422 N.W.2d at 627–28. Because the act of escaping official custody carries with it an inherent danger to the prisoner, police and correctional officers, and the public at large, the legislature is well within the bounds of reason in criminalizing

---

N.W.2d 624, 628 (1988) (alterations in original) (citations omitted).

**5.** Nor do I believe that this interpretation creates the sort of equal protection problem envisioned by the majority. Utah Code Annotated section 76–8–309(7) (1999) offers a broad definition for "official custody" that ranges from fleeing from an arrest, or from the custody of a transport officer, to leaving confinement in a jail or prison. Utah Code Ann. § 76–8–309(7)(b). From this language it is clear that the legislature intended

the act of leaving official custody to be the defining moment in the crime of escape. *See Maynard v. State,* 652 P.2d 489, 493 n. 7 (Alaska Ct.App.1982) ("[A]ny voluntary departure from the arresting officers' immediate presence without their consent was an escape; this would be true even if he had been recaptured almost immediately."). Thus, leaving the area of confinement, not the entire institutional grounds, with the goal of securing an illegal freedom, is the action prohibited by section 76–8–309.

the behavior as early in the process as is feasible. *See Kinney v. Indiana Youth Ctr.*, 950 F.2d 462, 465 (7th Cir.1991) ("[A] prisoner in the act of escaping may pose a serious threat to members of the community."); *see also United States v. Dickerson*, 77 F.3d 774, 777 (4th Cir.1996) ("[N]o one could credibly dispute the contention that an overt escape, especially an overt escape from a maximum security prison, inherently presents a serious potential risk of physical injury to another.").

¶ 30 Finally, I am also unpersuaded by the majority's arguments concerning attempted escape. First and foremost, it is clear from the statutory language, and the cases interpreting similar statutory language, that a prisoner must enjoy some level of success, albeit incomplete success, to be liable for the crime of escape.[6] *See Sugden*, 422 N.W.2d at 627–28. It is the success of leaving an area of authorized confinement that defines the crime of escape. Thus, had Germonto failed to scale the inner fence—the limits of his authorized confinement area at the time of his escape—his crime would have been attempted escape. But, in the face of his success in scaling the fence, Germonto escaped from official custody.[7]

¶ 31 Moreover, I see little difference between this interpretation and our interpretation of the robbery or burglary statutes, where our focus is not on the success of the criminal act as a whole; rather, we focus our analysis on the completion of certain acts to determine whether the statute has been violated. *See* Utah Code Ann. § 76–6–301 (1999) ("A person commits robbery if: (a) the person unlawfully and intentionally takes or *attempts to take* personal property in the possession of another from his person."); *id.* § 76–6–202 (1999) ("A person is guilty of burglary if he enters or remains unlawfully in a building or any portion of a building with

intent to commit a felony or theft or commit an assault on any person."). In the instant case, Germonto climbed over the inner fence with the knowledge that his actions would result in his leaving confinement without authorization. While he was not ultimately successful in leaving the prison grounds, much like burglary or robbery, by taking the material step of scaling the inner fence with the required intent, his actions satisfied the statutory elements of an unauthorized leaving a place of confinement, and thus, the trial court properly bound him over for trial.

¶ 32 Accordingly, I dissent from the majority opinion and would instead affirm the trial court's decision to bind Germonto over on the escape charge.

---

**6.** Escape is defined variously to mean: "an act or instance of escaping: as [a] flight from confinement[, or the] evasion of something undesirable." Merriam–Webster's Collegiate Dictionary 395 (10th ed.1999). Accordingly, escape refers not to a successful act, but rather to the "flight" or "evasion" involved. *Id.*

**7.** Compare the present circumstance of escaping from official custody within a prison to escaping from the custody of an arresting officer. In the

context of arrest, an escape occurs with the first step taken by a prisoner who is in the custody of an arresting officer. *See* Utah Code Ann. § 76–8–309(7)(b); *see also State v. Descoteaux*, 94 Wash.2d 31, 614 P.2d 179, 181 (1980) ("[D]efendant could be convicted of escape if he knew his actions would result in leaving confinement without permission."), *modified by State v. Danforth*, 97 Wash.2d 255, 643 P.2d 882 (1982).