2009 UT 46

**Cody M. O'DEA, Petitioner and Appellant,**

v.

**Ashley OLEA, Respondent.**

**Adoption Center of Choice, Third–Party Intervenor and Appellee.**

No. 20070818.

Supreme Court of Utah.

July 28, 2009.

Michael J. Boyle, Daniel S. Drage, Ogden, for appellant.

Larry S. Jenkins, Lance D. Rich, Salt Lake City, for appellee.

NEHRING, Justice:

## INTRODUCTION

¶ 1 Petitioner Cody O'Dea appeals the district court's order dismissing his claim to

establish paternity. The underlying issue in this case is whether the district court erred when it concluded that Mr. O'Dea waived any rights in relation to his child, including the right to assert paternity, the right to notice of any judicial proceeding in connection with the adoption of his child, and the right to consent to the adoption of his child. The district court concluded that Mr. O'Dea did not strictly comply with the criteria set forth in Utah Code section 78–30–4.14 (Supp. 2006)[1] after he was made aware that the birth mother was in Utah and therefore had no standing to assert any rights in relation to his child. Accordingly, the district court granted the Adoption Center for Choice's motion to dismiss.

¶ 2 Mr. O'Dea raises four issues on appeal. These are (1) whether the district court had an obligation to give full faith and credit to Mr. O'Dea's registration with the putative father registry in Wyoming; (2) whether a choice of law analysis should be used in applying Wyoming law since the most significant contacts during the relationship between Mr. O'Dea and the mother of his child were in Wyoming; (3) whether sections of the Utah Adoption Act unconstitutionally extend personal jurisdiction over out-of-state putative fathers, including Mr. O'Dea; and (4) whether sections of the Utah Adoption Act are facially unconstitutional because they do not provide immediate notice or a pre-deprivation hearing to putative fathers before preliminary placement of the child.

¶ 3 Mr. O'Dea did not raise any of these issues before the district court, and therefore they are not preserved on appeal. Furthermore, Utah Code section 78–30–4.14(11) is very clear that an unmarried putative father cannot maintain a right to consent to the adoption of his child unless he strictly complies with Utah law. Mr. O'Dea failed to comply strictly with Utah Code section 78–30–4.14(6) and has therefore waived all rights he may have had in relation to his child. The decision of the district court to grant the Center's motion to dismiss is affirmed.

1. In 2008, substantive changes were made to Title 78 of the Utah Code; therefore, we cite to the version in effect at the time that the events giving rise to this appeal occurred.

## BACKGROUND

¶ 4 While living in Sheridan, Wyoming, Mr. O'Dea and Ms. Olea were involved in an intimate relationship that resulted in Ms. Olea becoming pregnant in the fall of 2005. Sometime after learning she was pregnant, Ms. Olea moved to Buffalo, Wyoming. It was not until after Ms. Olea moved to Buffalo that Mr. O'Dea became aware of the pregnancy. Mr. O'Dea visited Ms. Olea in October and learned that she was considering an abortion. He attempted to change her mind and offered to help pay medical expenses and to provide a home for Ms. Olea.

¶ 5 Three weeks later, Ms. Olea contacted Mr. O'Dea and told him that she miscarried the child. At the time Mr. O'Dea believed this statement to be true, but in mid-May of the next year, Mr. O'Dea learned from a friend that Ms. Olea was possibly still pregnant. Mr. O'Dea contacted Ms. Olea and discovered that she was still pregnant and was planning on placing the child for adoption. On May 24, Mr. O'Dea indicated to Ms. Olea his desire to maintain a relationship with the child. Mr. O'Dea also contacted LDS Family Services in Montana, the agency with which he believed Ms. Olea would place the child, and notified them of his intent to maintain a relationship with the child. As a result, LDS Family Services in Montana terminated its adoption placement services to Ms. Olea.

¶ 6 By early June, Mr. O'Dea had placed his name on the putative father registries in both Wyoming and Montana.[2] Mr. O'Dea also sent a letter to Dennis Ashton of LDS Family Services in Utah informing him of his intent to maintain a relationship with the child on the belief that Mr. Ashton was the regional director of LDS Family Services in Montana, Wyoming, and Utah. At some point thereafter Ms. Olea traveled to Utah. On June 15, 2006, Mr. O'Dea received a call from Ms. Olea that originated from a blocked

2. It seems Mr. O'Dea's registration with the Montana putative father registry is in dispute. This question of fact, however, has no bearing on our analysis.

number. During the conversation, Ms. Olea told Mr. O'Dea,

> You will listen and you will not speak. First of all I want you to stop harassing me and that includes your mother. I am in Utah. You will not father this child. You will pay child support until the child is in college. You will never see this baby. Do you understand?

Mr. O'Dea stated that he did not understand, and Ms. Olea asked again if he understood. Mr. O'Dea again stated that he did not and asked if Ms. Olea meant that she was not placing the child for adoption. Ms. Olea responded, "If you understand what I have told you, that is all I have to say." She then terminated the call. Since the number was blocked, Mr. O'Dea could not call back.

¶ 7 Mr. O'Dea took this conversation to mean that Ms. Olea was not placing the child for adoption because she referred to him having to pay child support. As a result of the conversation, Mr. O'Dea was both "relieved" and "encouraged." Mr. O'Dea doubted the truth of Ms. Olea's statement regarding her residence in Utah because of her past misstatements and thus did not take any further action at the time to assert his parental rights in Utah.

¶ 8 Ms. Olea gave birth to a girl later that same day. The next day, she signed a document of Birth Mother Relinquishment.

¶ 9 Prior to the birth, the Adoption Center of Choice had begun preparing the legal framework for the adoption and sought to determine if notice of paternity for the child had been filed in the state of Wyoming. On June 15, the Center received a letter from Wyoming's Department of Family Services notifying the agency that Mr. O'Dea had filed a notice with Wyoming's putative father registry. The Center also regularly contacted the Utah Department of Health until July 6 to determine if proceedings to establish paternity had been initiated in Utah. The department's response was always negative.

¶ 10 Mr. O'Dea claims that he continued to search for Ms. Olea. He left multiple messages that were not returned and eventually asked the Buffalo police to investigate. The police informed Mr. O'Dea that they eventually spoke to Ms. Olea but that the baby was not with her. On July 23, Mr. O'Dea and his family created an Internet Website seeking information about the infant. Six days later, Ms. Olea's mother left a message on the Website that the child was born in Utah, placed for adoption, and the attorney was Larry S. Jenkins. The next day, July 30, Mr. O'Dea sent a letter to Mr. Jenkins requesting information regarding the adoption. Mr. Jenkins responded that an adoption had taken place but that Mr. O'Dea's action was too late because, under Utah law, he was required to file a paternity action in Utah within twenty days after becoming aware of a "qualifying circumstance," which in this case was that Ms. Olea temporarily resided in Utah. Mr. Jenkins informed Mr. O'Dea that because he failed to take the necessary action to establish paternity following Ms. Olea's phone call, no more information about the child could be provided.

¶ 11 On August 14, Mr. O'Dea filed proceedings in the state of Utah along with an affidavit stating his plan to parent the child as required by Utah Code section 78–30–4.14(6)(b) (Supp.2006). The following day, Mr. O'Dea signed a Notice of Commencement of Paternity Proceedings form that he intended to send to the state registrar of vital statistics within the Utah Department of Health. The acquaintance he charged with mailing the form, however, neglected to send it. On September 5, Mr. O'Dea signed a new form, which was received by the Utah Department of Health on September 8. The receipt of the form was more than eighty days after the birth of the child.

¶ 12 Shortly thereafter, Mr. O'Dea served a subpoena upon the Adoption Center to appear and testify in an October deposition. The subpoena requested that the Center reveal the attorneys who represented Ms. Olea in the adoption and any other documents or information it had concerning the adoption. The Center moved to quash the subpoena on the basis that the information sought was privileged and that Mr. O'Dea had waived his paternity rights by not strictly complying with the requirements found in section 78–30–4.14(6) within the twenty-day window prescribed in section 78–30–4.14(10)(b)(ii)(B)(I).

¶ 13 A hearing on the motion to quash was held January 10, 2007. Commissioner Arnett, who heard the motion, recommended that the motion be granted because Mr. O'Dea had waived his rights by not strictly complying with Utah's legal requirements. Mr. O'Dea filed an objection, but the district court adopted the recommendation at the end of January. Mr. O'Dea requested oral arguments on February 21. The Center opposed the motion and maintained that the district court's order was a final ruling.

¶ 14 In April, the district court held a status conference in which it heard arguments on the issue. Based on the arguments, the district court issued an order stating that the commissioner's recommendation to quash was not itself dispositive of Mr. O'Dea's parental rights. The court set the matter for evidentiary hearing to determine the Center's status as a party and to consider a proper motion to dismiss. The next day, the Center filed a motion to intervene as a party in the proceedings in order to move to dismiss the petition. The court granted the petition to intervene since Ms. Olea had relinquished her parental rights and the Center was an interested party. At the end of August, the court heard arguments regarding the motion to dismiss. The district court granted the Center's motion to dismiss. The court held that Mr. O'Dea was without standing because he failed to comply strictly with section 78–30–4.14(6), (10) and accordingly waived his rights in relation to the child. Mr. O'Dea appealed to the Utah Court of Appeals, which certified the appeal to us pursuant to Utah Rule of Appellate Procedure 43(a). We have jurisdiction pursuant to Utah Code section 78A–3–102(3)(b) (2008).

## STANDARD OF REVIEW

¶ 15 "We review a district court's interpretation of a statute for correctness. We review a district court's findings of fact under a clearly erroneous standard. And we review a district court's ruling regarding a statute's constitutionality for correctness." *H.U.F. v. W.P.W.*, 2009 UT 10, ¶ 19, 203 P.3d 943 (citations omitted). We recognize, however, that generally an appellant must properly preserve an issue in the district court before it will be reviewed on appeal. *Badger v. Brooklyn Canal Co.*, 966 P.2d 844, 847 (Utah 1998); *see also* Utah R.App. P. 24(a)(5).

## ANALYSIS

¶ 16 We first address whether Mr. O'Dea preserved the four issues he has raised on appeal. We conclude that he did not preserve any of the four. Next, we address whether Mr. O'Dea has waived all rights in relation to his child, including consent to the adoption and notice of any relevant hearing under Utah Code section 78–30–4.14(11) (Supp.2006). We conclude that Mr. O'Dea was obligated to comply strictly with Utah law, that he failed to comply, and therefore he waived all rights in relation to his child.

## I. MR. O'DEA DID NOT PRESERVE VARIOUS ISSUES BECAUSE HE FAILED TO RAISE ANY OF THE ARGUMENTS IN THE DISTRICT COURT, AND HE DID NOT PROVIDE GROUNDS FOR AN EXCEPTION

¶ 17 In his appeal, Mr. O'Dea raises four issues. These are (1) whether the district court had an obligation to give full faith and credit to Mr. O'Dea's registration with the putative father registry in Wyoming, (2) whether a choice of law analysis should be used in applying Wyoming law since the most significant contacts during the relationship were in Wyoming, (3) whether the Utah Adoption Act unconstitutionally allows a Utah court to exercise personal jurisdiction over out-of-state fathers, and (4) whether sections of the Utah Adoption Act are facially unconstitutional because they do not provide immediate notice or a pre-deprivation hearing to putative fathers before preliminary placement of the child. To show these issues were preserved to the district court, Mr. O'Dea has referenced the Memorandum in Support of Motion to Quash Subpoena, Objection to Commissioner's Recommendation, Memorandum in Opposition to Motion to Intervene and to Dismiss, and other related motions and memoranda made to the district court. After reviewing the record, we find that none of the issues were raised in the district court and therefore were not properly preserved.

¶ 18 "[T]o preserve an issue for appellate review, a party must first raise the issue in the trial court," because "a trial court must be offered an opportunity to rule on an issue." *Badger v. Brooklyn Canal Co.,* 966 P.2d 844, 847 (Utah 1998). The Utah Rules of Appellate Procedure require that an appealing party's brief provide either "(A) [a] citation to the record showing that the issue was preserved in the trial court; or (B) a statement of grounds for seeking review of an issue not preserved in the trial court." Utah R.App. P. 24(a)(5)(A)-(B). To properly preserve an issue at the district court, the following must take place: "(1) the issue must be raised in a timely fashion; (2) the issue must be specifically raised; and (3) a party must introduce supporting evidence or relevant legal authority." *Badger,* 966 P.2d at 847 (internal quotation marks omitted). "The purpose of such requirements is to put the judge on notice of the asserted error and allow the opportunity for correction at that time in the course of the proceeding." *Id.* (alteration omitted) (internal quotation marks omitted). The presence of a constitutional issue does not excuse an appellant from complying with the preservation rules set by this court and the Utah Rules of Appellate Procedure. *State v. Holgate,* 2000 UT 74, ¶ 11, 10 P.3d 346.

¶ 19 The four arguments Mr. O'Dea now presents on appeal were not presented at the district court level. As a result, the district court did not have the opportunity to give full consideration to the issues at that time. Not only did Mr. O'Dea fail to raise the issues to the district court, but he also omitted from his appellate brief a statement of grounds for seeking review of the unpreserved issues, such as an assertion of exceptional circumstances or plain error, as required by rule 24(a)(5)(B). We will review each of Mr. O'Dea's issues and the citations to the record that he claims preserves them.

*A. Mr. O'Dea Failed to Preserve His Claim That the District Court Had an Obligation to Give Full Faith and Credit to Mr. O'Dea's Registration with the Putative Father Registries in Other States*

¶ 20 In his brief, Mr. O'Dea argues that Utah should give full faith and credit to

any paternity determination made by Wyoming. We find no such argument raised in the pleadings referenced by Mr. O'Dea or in any other pleading filed with the district court. The record explains Wyoming's law concerning putative fathers and the steps Mr. O'Dea took to have his name put on the Wyoming and Montana putative father registries. It does not, however, provide a basis to believe that the district court was alerted to Mr. O'Dea's full faith and credit claim. We conclude therefore that the claim was not preserved, and we will not consider it.

*B. Mr. O'Dea Has Failed to Preserve His Claim That a Choice of Law Analysis Should Be Used*

¶ 21 Second, Mr. O'Dea argues the district court erred in not applying a choice of law analysis. His citation to the record, however, does not address a choice of law argument. Rather, he references the steps he took to locate Ms. Olea and subsequent attempts to comply with Wyoming and Montana laws. He further lists the steps Ms. Olea took to mislead him about her pregnancy. We are, however, unable to find a point in the record in which Mr. O'Dea raised this argument or indicated that the district court's failure to adopt a correct choice of law approach was error. Because Mr. O'Dea did not raise this argument below, he did not preserve it and we will not address it.

*C. Mr. O'Dea Has Failed to Preserve His Claim That the Utah Adoption Act Is Unconstitutional as It Applies to Out-of-State Putative Fathers*

¶ 22 Mr. O'Dea argues that Utah Code section 78–30–4.14 is unconstitutional because it exercises personal jurisdiction over out-of-state putative fathers based on the infant's presence in Utah and contains no other requirement that putative fathers have other contacts with the forum state. Utah Code section 78–30–7(4)(a) states, "If a person whose consent for the adoption is required under Section 78–30–4.14 cannot be found within the state, the fact of the minor's

presence within the state shall confer jurisdiction on the court in proceedings under this chapter as to such absent person...." As evidence that this issue was raised below and sufficiently preserved, Mr. O'Dea directs us to facts presented to the district court. The facts include Mr. O'Dea's and Ms. Olea's residencies at the time of conception and during the pregnancy, Mr. O'Dea's presence in Wyoming at the time Ms. Olea relinquished the child, and obstacles preventing Mr. O'Dea's ability to comply with Utah law including Ms. Olea's travel between Wyoming, Montana, and Utah. These statements do not speak to the matter of personal jurisdiction and, therefore, do not sufficiently preserve Mr. O'Dea's argument that section 78-30-4.14 unconstitutionally exercises personal jurisdiction over Mr. O'Dea or putative fathers generally. Mr. O'Dea has only argued that, due to the facts of this case, he should not have been required to comply strictly with the laws of Utah. Because Mr. O'Dea did not sufficiently raise this issue below, it is not preserved and we will not address it.

### D. Mr. O'Dea Has Failed to Preserve His Claim That the Utah Adoption Act Is Facially Unconstitutional Because It Does Not Provide Notice or a Right of Hearing for Putative Fathers

¶ 23 Mr. O'Dea next argues that sections of the Utah Adoption Act are facially unconstitutional. He argues that because the Utah Adoption Act does not require that a putative father who has strictly complied with Utah Code section 78-30-4.14 receive a pre-deprivation hearing before the petitioner for adoption or adoption agency is given custody of the child, Utah Code section 78-30-4.22 (2002), which allows the child to be placed with the petitioner for adoption or an adoption agency after an adoption petition has been filed, but before a final hearing has been scheduled, is facially unconstitutional. Again, Mr. O'Dea failed to properly preserve the issue for appeal. We cannot find in the record an instance in which Mr. O'Dea argued to the district court that Utah code section 78-30-4.22, or any related section, is unconstitutional on its face. Rather, in the district court, Mr. O'Dea argued that because he manifested an intent to retain his parental rights throughout Ms. Olea's pregnancy and because Ms. Olea was deceptive concerning the state of her pregnancy and her location, it would be "fundamentally unfair" to require Mr. O'Dea to comply strictly with the Utah Adoption Act.

¶ 24 These arguments, however, do not address the facial constitutionality of section 78-30-4.22. As further evidence that the argument was not made below, the district court found in the Order Granting Motion to Dismiss that Mr. O'Dea "does not challenge the constitutionality of Utah's adoption statute." Because the arguments made below do not sufficiently raise the argument for purposes of preservation that section 78-30-4.22 is unconstitutional on its face or that the district court erred in failing to address the issue, we will not address the issue.

### II. MR. O'DEA HAD THE REQUISITE KNOWLEDGE THAT MS. OLEA TEMPORARILY RESIDED IN UTAH, AND ACQUISITION OF THAT KNOWLEDGE REQUIRED HIM TO COMPLY STRICTLY WITH UTAH LAW TO RETAIN ANY RIGHTS IN RELATION TO THE CHILD

¶ 25 Mr. O'Dea did not sufficiently preserve the claims described in Section I of this opinion. Mr. O'Dea presented those arguments as an attempt to collaterally challenge the effect of his failure to comply strictly with the requirements imposed by Utah law for an unmarried biological father to retain rights in relation to the child. Because Mr. O'Dea's failure to comply strictly with Utah law formed the basis of the district court's Order to Dismiss, we will now address whether the district court correctly determined that Mr. O'Dea failed to secure rights in relation to his child based on his failure to comply with Utah law. Although Mr. O'Dea did not explicitly appeal the district court's application of the facts to the relevant statutory framework in his appellate brief, we do so here to address Mr. O'Dea's consistent argument that section 78-30-4.14(10) (Supp. 2006) allows expectant mothers to "forum

shop," and that he was not required to comply strictly with Utah law.

¶ 26 The district court determined that Mr. O'Dea was required to comply strictly with Utah Code section 78–30–4.14(6) because he had the requisite knowledge of a "qualifying circumstance,"[3] which in this case was Ms. Olea's temporary residence in Utah. The district court held that under the statutory framework of Utah Code section 78–30–4.14(10), Mr. O'Dea was required to comply strictly with Utah law regardless of whether he complied with Wyoming law because he knew of a "qualifying circumstance."

¶ 27 We affirm the district court and hold that a qualifying circumstance existed in this case and that the phone call made by Ms. Olea to Mr. O'Dea informing him that she was "in Utah" gave Mr. O'Dea knowledge that a qualifying circumstance, Ms. Olea's temporary residence in Utah, existed. Because Mr. O'Dea had the requisite knowledge of the qualifying circumstance, he was required to comply strictly with Utah law before the latter of Ms. Olea's relinquishment of the child or twenty days after Mr. O'Dea received notice of the qualifying circumstance in order to retain any rights in relation to the child. Utah Code Ann. § 78–30–4.14(11) ("An unmarried biological father who does not fully and strictly comply with the requirements ... is considered to have waived and surrendered any right in relation to the child...."). Because Mr. O'Dea did not comply with section 78–30–4.14(6) within the statutory time limit, Mr. O'Dea waived any rights he had in relation to the child, including the right to consent to the adoption and the right to receive notice of a hearing. *Id.* § 78–30–4.14(11); *C.F. v. D.D. (In re B.B.D.)*, 1999 UT 70, ¶ 12, 984 P.2d 967. After a discussion of the statutory framework applicable to Mr. O'Dea, we discuss the district court's determination.

### A. The Statutory Framework for Unmarried Biological Fathers Applicable to Mr. O'Dea

¶ 28 Under Utah law, an unmarried biological father of a child under six months of age

waives all rights in relation to his child, including rights associated with consent to adoption and notice of a hearing, if he does not strictly comply with the requirements set forth in section 78–30–4.14(6). Utah Code Ann. § 78–30–4.14(11). An unmarried biological father can only establish himself as a person who must consent to the adoption of the child if he strictly complies with the following requirements:

(a) initiates proceedings to establish paternity under Title 78, Chapter 45g, Utah Uniform Parentage Act;

(b) files with the court that is presiding over the paternity proceeding a sworn affidavit:

(i) stating that he is fully able and willing to have full custody of the child;

(ii) setting forth his plans for care of the child; and

(iii) agreeing to a court order of child support and the payment of expenses incurred in connection with the mother's pregnancy and the child's birth;

(c) consistent with Subsection (7), files notice of the commencement of paternity proceedings with the state registrar of vital statistics within the Department of Health, in a confidential registry established by the department for that purpose; and

(d) offered to pay and paid a fair and reasonable amount of the expenses incurred in connection with the mothers' pregnancy and the child's birth, in accordance with his financial ability, unless:

(i) he did not have actual knowledge of the pregnancy;

(ii) he was prevented from paying the expenses by the person or authorized agency having lawful custody of the child; or

(iii) the mother refuses to accept the unmarried biological father's offer to pay the expenses described in this Subsection (6)(d).

*Id.* § 78–30–4.14(6)(a)–(d). These requirements must be completed before the day on

---

**3.** A "qualifying circumstance" is an event, defined by Utah Code section 78–30–4.14(10)(a), that triggers the obligation of an unmarried putative father to comply strictly with Utah's paternity statute to secure rights in relation to his child.

which the birth mother executes her consent for the adoption or relinquishes the child for adoption. *Id.* § 78–30–4.14(6).

¶ 29 Two statutory exceptions excuse the unmarried biological father from strict compliance. The first exception addresses unmarried biological fathers who "did not know, and through the exercise of reasonable diligence could not have known, before the time the mother executed a consent to adoption or relinquishment of the child for adoption, that a qualifying circumstance existed." *Id.* § 78–30–4.14(10)(b)(i)(A). Fathers who meet this standard, but who "fully complied with the requirements to establish parental rights in the child, and to preserve the right to notice" in the state where the father knew or should have known the mother resided before relinquishment of the child or the state of conception, do not waive their rights to consent to the adoption or to receive notice of a hearing even if the fathers do not strictly comply with the requirements of section 78–30–4.14(6). *Id.* § 78–30–4.14(10)(b)(i)(B).

¶ 30 The second exception addresses unmarried biological fathers who "knew, or through the exercise of reasonable diligence should have known, before the time the mother executed a consent to adoption or relinquishment of the child for adoption, that a qualifying circumstance existed." *Id.* § 78–30–4.14(10)(b)(ii)(A). A father who falls under this second standard of knowledge must comply with all the requirements listed in section 78–30–4.14(6) before the latter of the date the birth mother executed a consent to adoption or relinquishment of the child or twenty days after the unmarried biological father knew or should have known through reasonable diligence that a qualifying circumstance existed. *Id.* § 78–30–4.14(10)(b)(ii)(B). Fathers who fall under this exception are not excused from completing the four requirements listed in section 78–30–4.14(6), but rather are granted a brief extension of time to complete the requirements. Thus, the analysis of whether Mr. O'Dea was eligible to avail himself of this exception depends on whether he knew, or should have known through reasonable diligence, that a qualifying circumstance existed. If Mr. O'Dea knew or should have known a qualifying circumstance existed, strict com-

pliance with another state's paternity requirements will not preserve his parental rights in Utah. Rather, he must still strictly comply with the requirements listed in section 78–30–4.14(6).

¶ 31 Because we find that the phone call made by Ms. Olea to Mr. O'Dea informing him that she was in Utah gave Mr. O'Dea sufficient notice that a qualifying circumstance existed, we do not reach whether Mr. O'Dea's compliance with Wyoming or Montana law establishes his right to consent to the adoption or to receive notice of any judicial proceeding concerning the adoption in Utah. Having established the statutory framework of Mr. O'Dea's claim, we now address whether Mr. O'Dea is subject to strict compliance to Utah Code section 78–30–4.14(6).

*B. A Qualifying Circumstance Existed Because Ms. Olea Temporarily Resided in Utah*

¶ 32 Before reaching the question of Mr. O'Dea's knowledge, we first discuss the existence of a qualifying circumstance. A qualifying circumstance under Utah Code section 78–30–4.14(10)(a) is any of the following that occurs between the date of conception and the date the mother executes a consent to adoption:

(i) the child or the child's mother resided, on a permanent or temporary basis, in the state of Utah;

(ii) the mother intended to give birth to the child in the state of Utah;

(iii) the child was born in the state of Utah; or

(iv) the mother intended to execute a consent to adoption or relinquishment of the child for adoption:

(A) in the state of Utah; or

(B) under the laws of the state of Utah.

In interpreting statutes "we look first to the statute's plain language to determine its meaning." *H.U.F. v. W.P.W,* 2009 UT 10, ¶ 32, 203 P.3d 943 (internal quotation marks omitted). "We read the plain language of a statute as a whole and interpret its provisions in harmony with other provisions in the

same statute and with other statutes under the same and related chapters." *Id.* Accordingly, "[w]e seek an interpretation that renders all parts of a statute relevant and meaningful, and interpretations are to be avoided which render some part of a provision nonsensical or absurd." *Id.* (internal quotation marks omitted). When discerning the plain meaning of the statute, terms that "are used in common, daily, nontechnical speech, should, in the absence of evidence of a contrary intent, be given the meaning which they have for laymen in such daily usage." *Gov't Employees Ins. Co. v. Dennis*, 645 P.2d 672, 675 (Utah 1982) (internal quotation marks omitted).

¶ 33 The Center argues that a qualifying circumstance existed under section 78–30–4.14(10)(a)(i) because Ms. Olea temporarily resided in Utah.[4] It seems that the district court and the parties assumed that Ms. Olea was residing on a temporary basis in Utah when she made the call to Mr. O'Dea. We address this conclusion to make clear that a qualifying circumstance must itself exist before a determination of the father's knowledge of the qualifying circumstance is determined.

¶ 34 This court has defined the term "reside" as "[t]o dwell permanently or for a length of time; to have settled abode for a time." *Knuteson v. Knuteson*, 619 P.2d 1387, 1389 (Utah 1980) (emphasis omitted) (internal quotation marks omitted). We have also recognized that the term "resident" "has no precise, technical, and fixed definition applicable in all contexts and to all cases." *Gov't Employees Ins. Co.*, 645 P.2d at 674. With these previously established concepts in the background, we interpret section 78–30–4.14(10)(a)(i) in a way that gives meaning to the term "temporarily" and also takes into account the unique situation addressed by the Utah adoption framework.

¶ 35 The time period between conception and relinquishment of the child for adoption is brief. Childbearing and adoption also carry unique emotional decisions and consider-

ations. The legislature has, therefore, specifically stated that "an unmarried mother, faced with the responsibility of making crucial decisions about the future of a newborn child, is entitled to privacy, and has the right to make timely and appropriate decisions regarding her future and the future of the child." Utah Code Ann. § 78–30–4.12(2)(b).

¶ 36 We decline to adopt a rule that establishes a minimum amount of time a mother must remain in Utah to become a temporary resident. While it is unclear from the record exactly how long Ms. Olea was located in Utah around the time of the birth, the totality of the circumstances in this case suggests that Ms. Olea temporarily resided in Utah. As discussed below, Mr. O'Dea has not presented a compelling argument that he was not put on notice that a qualifying circumstance existed or presented a compelling argument as to why Ms. Olea's presence in Utah did not constitute a temporary residence. We, therefore, find that the district court was not in error in determining the existence of a qualifying circumstance.

### C. *Mr. O'Dea Knew or Should Have Known That Ms. Olea Temporarily Resided in the State Because She Told Him She Was "In Utah"*

¶ 37 We now answer the question of whether Mr. O'Dea knew, or with reasonable diligence should have known, that the qualifying circumstance existed. An unmarried biological father who knows or "through the exercise of reasonable diligence should have known" that one or more qualifying circumstances existed waives any right to consent to the adoption or to receive notice of any related hearings in relation to his child if he does not strictly comply with section 78–30–4.14(6). Utah Code Ann. § 78–30–4.14(11).

¶ 38 The district court held that Mr. O'Dea knew a qualifying circumstance existed because Ms. Olea told him during the phone call that she was "in Utah." By placing a telephone call to Mr. O'Dea, Ms. Olea did not

---

4. As the district court noted in its Order to Dismiss, "It is also possible to conclude that the Petitioner was, or should have been, aware that Respondent intended to give birth in Utah." We do not address whether such a situation exists in

this case because we agree with the district court that "[b]ecause Petitioner has conceded that he was told that Respondent was in Utah ... it is not necessary to conclude that a second qualifying event also occurred in this case."

create a qualifying circumstance. We conclude, however, that by communicating to Mr. O'Dea that she was "in Utah," Ms. Olea called attention to her whereabouts and placed Mr. O'Dea on inquiry notice to perceive the true state of affairs concerning Ms. Olea and the child she was carrying.

¶ 39 The district court determined that Mr. O'Dea's knowledge that a qualifying circumstance existed, which in this case was Ms. Olea's temporary residence in Utah, must rise to an objective level of inquiry notice. We agree with this reasoning. The plain words of the statute do not require that an unmarried biological father have the quantum of knowledge sufficient to form an absolute certainty in the father's mind free from any subjective doubt that a qualifying circumstance has existed or presently exists. Rather, the statute requires only that a father have knowledge or have received sufficient notice that a qualifying circumstance existed sufficient to alert him to conduct further inquiry. Whether the father actually undertakes further inquiry is irrelevant to his obligation to comply strictly with Utah Code section 78–30–4.14(6) within the time limits set forth in subsection (10)(b)(ii) which arises at the moment he obtains notice that a qualifying circumstance existed.

¶ 40 The phrase "knew, or through the exercise of reasonable diligence should have known," mirrors language we have adopted to aid in ascertaining whether a plaintiff was aware that a statute of limitations has began to run. *See Baldwin v. Burton,* 850 P.2d 1188, 1196 (Utah 1993) (discussing application of discovery rule to statute of limitations in fraud case). A duty to inquire further into the existence of a fact may "'occur when circumstances arise that should put a reasonable person on guard.'" *First Am. Title Ins. Co. v. J.B. Ranch, Inc.,* 966 P.2d 834, 837 (Utah 1998) (quoting *Meyer v. Gen. Am. Corp.,* 569 P.2d 1094, 1097

(Utah 1977)). It is well established that "[w]hatever is notice enough to excite attention and put the party on his guard and call for inquiry is notice of everything to which such inquiry might have led." *Id.* at 838 (internal quotation marks omitted). In other words, "[w]hen a person has sufficient information to lead him to a fact, he shall be deemed conversant of it." *Id.* (internal quotation marks omitted).

¶ 41 Placing an objective standard on determining whether a father had notice that a qualifying circumstance existed further supports the state's "compelling interest in providing stable and permanent homes for adoptive children in a prompt manner" and preserving a birth mother's entitlement "to privacy ... [and] to make timely and appropriate decisions regarding her future and the future of the child." Utah Code Ann. § 78–30–4.12(2)(b).

¶ 42 While we agree that Ms. Olea's phone call was certainly abrupt and one-sided, it unequivocally communicated to Mr. O'Dea that Ms. Olea was in Utah.[5] The statement, "I am in Utah" was stated without condition or exception. Analyzing the statement objectively, we conclude that it sufficiently put Mr. O'Dea on inquiry notice that Ms. Olea resided in Utah at least on a temporary basis. This inquiry notice placed the burden on Mr. O'Dea to comply strictly with Utah Code section 78–30–4.14(6) within the time period set forth in section 78–30–4.14(10)(b)(ii)(B).

¶ 43 Mr. O'Dea has extensively argued that the phone call did not constitute notice that Ms. Olea was temporarily residing in Utah because Ms. Olea deceived him in the past about the state of her pregnancy and her location. He also argues that Ms. Olea's statements made during the phone call, such as her statement that he would pay child support, negated any indication that a qualifying circumstance existed. Under Utah

5. We agree with the district court that the Center embraced legal form over substance in this matter. There is evidence to suggest that the Center knew of Mr. O'Dea's attempts to assert paternity in other states. While we acknowledge that an adoption agency has no affirmative duty to inform an unmarried biological father that a child exists or that the expectant mother has chosen to place the child for adoption, we encourage adoption agencies to take further steps to ensure less chance of litigation after the child has been placed for adoption. It is quite possible that the district court was correct in its statement that by embracing legal form over substance, "the [Center] may have caused unnecessary harm."

Code section 78–30–4.15(1), a father "is not excused from strict compliance ... based upon any action, statement, or omission of the other parent or third parties." Although Ms. Olea was not fully truthful with Mr. O'Dea during her pregnancy as to the existence of the pregnancy and her location, this deceit does not negate the unambiguous notification that she was in Utah under section 78–30–4.15. The statement "I am in Utah" placed Mr. O'Dea on inquiry notice that Ms. Olea was residing in Utah, even if on a temporary basis. His compliance with other states' paternity laws do not overcome this notice.

¶ 44 Mr. O'Dea also argues that an affirmance of the district court's dismissal of the case will encourage expectant mothers to "forum-shop" Utah's adoption laws. While this argument may have some merit, it is not the place of this court to question the policy objectives of the legislature. The legislature has stated that an unmarried biological father only "has an inchoate interest," *id.* § 78–30–4.12(2)(e), and if he "fails to grasp the opportunities ... his biological parental interest may be lost entirely, or greatly diminished ... by his failure to strictly comply with the available legal steps to substantiate it," *id.* § 78–30–4.12(3)(b). To place a subjective standard on whether an unmarried biological father knew a qualifying circumstance existed and to inquire into the expectant mother's choices would in most cases unduly hamper the legislature's clear policy objectives.

¶ 45 We, therefore, hold that Mr. O'Dea had notice sufficient to give him knowledge that a qualifying circumstance existed, which in this case was Ms. Olea's temporary residence in Utah. Mr. O'Dea had twenty days from June 15 to comply strictly with Utah Code section 78–30–4.14(6). Instead, Mr. O'Dea completed the requirements to establish paternity more than eighty days after he received notice Ms. Olea was in Utah. Therefore, Mr. O'Dea did not timely assert his right to consent to the adoption or receive notice of a hearing. The district court's order granting the Center's motion to dismiss is therefore affirmed.

## CONCLUSION

¶ 46 We hold that Mr. O'Dea did not preserve the issues concerning full faith and credit to compliance with Wyoming law, choice of law, personal jurisdiction, and facial constitutionality of sections of the Utah Adoption Act. We cannot find sufficient objections made on the record and Mr. O'Dea has not stated sufficient grounds for reviewing an issue not preserved in the district court. We also hold that the phone call made to Mr. O'Dea in which Ms. Olea stated "I am in Utah" gave him adequate inquiry notice that a qualifying circumstance existed. Because Mr. O'Dea knew or should have known the qualifying circumstance existed, he was required to comply strictly with Utah law in order to retain any right in relation to his child, including his right to consent to adoption or receive notice of any applicable hearing. Mr. O'Dea failed to comply, and we therefore affirm the district court's Order Granting Motion to Dismiss Petitioner's Claim for Lack of Standing.

¶ 47 Associate Chief Justice DURRANT and Justice WILKINS concur in Justice NEHRING's opinion.

DURHAM, Chief Justice, dissenting:

¶ 48 I respectfully dissent.

¶ 49 The majority opinion concedes that "[b]y placing a telephone call to Mr. O'Dea, Ms. Olea did not *create* a qualifying circumstance." *Supra* ¶ 38 (emphasis added). The opinion also points out that the trial court and the parties "assumed" that Ms. Olea was "residing on a temporary basis in Utah" when she made the call to Mr. O'Dea. The record does not reflect any facts, other than the telephone call, made on the very day Ms. Olea gave birth, to support the conclusion that a qualifying circumstance actually existed. I assume that a one- to three-day hospital stay in Utah, for the sole purpose of giving birth and relinquishing an infant for adoption, was not what the legislature intended by "resided, on a permanent or temporary basis, in the state of Utah." *See* Utah Code Ann. § 78–30–4.14(10)(a) (Supp.2006). I further believe there is a legal distinction between the concept of "residence" and that

of a "visit" or brief "stay." Absent such a distinction, Utah risks becoming a magnet for those seeking to unfairly cut off opportunities for biological fathers to assert their rights to connection with their children. Not every unmarried biological father is indifferent to or unworthy of such connections. Many would marry the mothers of their children if they could, and many would make suitable and loving parents.

¶ 50 Thus, while I do not necessarily disagree with the conclusion that Mr. O'Dea had "sufficient notice" under our statute, I do conclude that the record in this case is entirely insufficient to establish that the qualifying circumstance of residence actually existed. I would, therefore, reverse and remand for an evidentiary hearing on that question.

¶ 51 Justice PARRISH concurs in Chief Justice DURHAM'S dissenting opinion.