**2013 UT App 122**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF M.J. AND T.J., PERSONS UNDER
EIGHTEEN YEARS OF AGE.

J.J.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20120560-CA
Filed May 16, 2013

Fourth District Juvenile, Spanish Fork Department
The Honorable Sterling B. Sainsbury
No. 1040653

Neil D. Skousen, Attorney for Appellant
John E. Swallow and John M. Peterson, Attorneys
for Appellee
Martha Pierce, Guardian ad Litem

JUDGE CAROLYN B. MCHUGH authored this Opinion, in which
JUDGES JAMES Z. DAVIS and MICHELE M. CHRISTIANSEN
concurred.

McHUGH, Judge:

¶1     J.J. (Mother) appeals the juvenile court's order terminating
her parental rights in M.J. and T.J. (collectively, the Children),
claiming that there was insufficient evidence to demonstrate that
termination was in the Children's best interests. We affirm.

BACKGROUND

¶2 Mother's history with the juvenile court and the Division of Child and Family Services (DCFS) dates back to 2003. By 2005, DCFS had removed Mother's and A.J.'s (Father) three older children due to repeated incidents of domestic violence in their presence. Eventually, both Mother and Father voluntarily relinquished their parental rights to those three children, who were later adopted by Adoptive Mother and Adoptive Father (collectively, the Adoptive Parents).

¶3 Mother and Father subsequently had two additional children who are the subject of these proceedings: M.J., born in 2009, and T.J., born in 2010. In August 2010, the State successfully filed a motion and petition seeking expedited custody for the removal of the Children, based primarily on domestic violence in the home. After the Children were removed, DCFS contacted the Adoptive Parents to inquire whether they wished to be foster parents to the Children. The Adoptive Parents declined because Adoptive Father had recently lost his job and they were not in a financial position to take the Children.

¶4 On September 13, 2010, the juvenile court allowed the Children to return to Mother because Father was incarcerated and a protective order was in place. However, Father was released from jail the following day. Father repeatedly violated the protective order, and he and Mother resumed their pattern of engaging in multiple incidents of domestic violence in the presence of the Children. As a result, the juvenile court issued a warrant to take the Children into DCFS custody on November 2, 2010.

¶5 After a permanency hearing on December 2, 2010, the juvenile court adopted a reunification plan that required Mother to participate in a mental health evaluation and domestic violence counseling, and to secure employment and housing. The original foster placement proved unsuccessful and, in July 2011, DCFS sought a new foster arrangement for the Children. The DCFS

caseworker (the Caseworker) again considered placing the Children with the Adoptive Parents. However, they were not licensed as foster parents at that time. Therefore, the Children were placed with their current Foster Mother and Foster Father (collectively, the Foster Parents). During the following year, the juvenile court had numerous hearings to monitor Mother's progress toward reunification. At no point during these hearings did Mother object to the Children's placement with the Foster Parents, or suggest that they should be placed with the Adoptive Parents.

¶6     At a permanency hearing on December 15, 2011, the Caseworker informed the juvenile court that Mother had been lying about participating in domestic violence treatment. Based upon Mother's failure to begin domestic violence treatment and her continued lack of stable housing, the juvenile court found that Mother was no longer in substantial compliance with her treatment plan and terminated reunification services. The juvenile court then granted Mother's counsel's request for an assessment of Mother's relationship with the Children (Assessment) and instructed the parties to agree upon a therapist.

¶7     The State filed a petition for termination of Mother's parental rights on January 9, 2012. At the pretrial hearing, the parties agreed that Dr. Darin Featherstone would complete the ordered Assessment. The matter was then continued, pending its completion.

¶8     Dr. Featherstone completed the Assessment in March 2012. Dr. Featherstone interviewed Mother, the Foster Parents, the Caseworker, and the Children's Guardian ad Litem. He also compared the interactions between the Children and the Foster Parents to the interactions between the Children and Mother. In addition, Dr. Featherstone reviewed the DCFS files and other relevant documents. Based on that information, Dr. Featherstone concluded that (1) Mother failed in her efforts to assume a "primary 'parenting role'" and the Foster Parents had assumed that

role; (2) Mother neglected the Children and failed to protect them from harm, whereas the Foster Parents had never neglected the Children's needs; (3) the Children rely upon their Foster Parents for their physical, emotional, and psychological well-being and have formed "critical attachments" to them; (4) separating the Children from their Foster Parents would be psychologically and emotionally damaging, whereas separation from Mother would cause little, if any, psychological damage to the Children; (5) Mother failed to provide for the Children's basic needs, while the Foster Parents have done so; and (6) Mother failed to substantially or consistently contribute to the Children's "emotional needs, personal well-being and financial requirements."

¶9     At the termination trial on April 13, 2012, Father voluntarily relinquished his parental rights in the Children. Thereafter, the Caseworker testified extensively regarding Mother's efforts to comply with her service plan. He explained that she was homeless, that she continued to struggle with attending individual therapy, that she had lied about attending domestic violence classes, and that she had failed to complete her domestic violence assessment until January 2012. The Caseworker further stated that the Children were "doing really well with [Foster Parents]" and the Foster Parents had "consistently provided for [the Children's] . . . [therapeutic] needs." Concerning the potential placement of the Children with the Adoptive Parents, the Caseworker indicated that they were not in a position to take the Children when they were originally removed and that they were not a licensed placement when the Children were moved to a new foster arrangement in July 2011.

¶10     Dr. Featherstone also testified at the termination trial. He indicated that the Foster Parents were the Children's primary attachment figures, that a permanent custody and guardianship arrangement or long-term foster care arrangement would not be appropriate, and that the additional disruption of placing the Children with the Adoptive Parents would be a "risk" to their well-being. Additionally, Dr. Featherstone indicated that the Children

had no existing bond with their older siblings, who had been adopted before the Children were born. According to Dr. Featherstone, visitation with their older siblings could be problematic for the Children.

¶11 Foster Mother also testified, indicating that she and Foster Father wished to adopt the Children. Foster Mother opined that although the Children enjoyed Mother's visits, the Children tended to regress in their development after visits with Mother. She believed the Children would be fine if they lost contact with Mother but also indicated that she would be willing to allow the Children to have contact with their older siblings.

¶12 Next, Adoptive Mother testified, indicating that she would like the Children to be placed in her care because it is "really important that [the Children and the older children] know each other and that they . . . have that opportunity to . . . grow up together in the same home." However, Adoptive Mother admitted that neither she nor any of Mother's older children had any relationship with the Children. Adoptive Mother also indicated that she first contacted DCFS regarding placing the Children in her care in March 2012, and that she had not contacted DCFS previously because she believed the Children would be reunited with Mother.

¶13 During Adoptive Mother's testimony, Mother's counsel argued for the first time that federal law mandated that DCFS make reasonable efforts to place the Children with their biological siblings and, if not, to document why such a placement did not take place. The juvenile court explained that the question of the Children's ultimate placement was one that could be addressed post-termination, but Mother's counsel disagreed. After Mother's counsel asked for and was granted leave to brief this issue, the juvenile court continued the termination trial.

¶14 On April 24, 2012, Mother filed a motion to place the Children with the Adoptive Parents, arguing that DCFS had a duty

to place the Children with their older siblings under DCFS guidelines, Utah Code section 78A-6-312, and 42 U.S.C. § 671. The State and the Guardian ad Litem opposed the motion, arguing that placement is not relevant to a termination proceeding and that it would not be in the best interests of the Children to be separated from the Foster Parents.

¶15    When the termination trial resumed on May 3, 2012, the juvenile court dismissed Mother's motion for placement with the Adoptive Parents. In its ruling, the juvenile court emphasized that it considered the question of whether the Children should remain in their current placement or be transferred to the Adoptive Parents irrelevant to whether Mother's parental rights should be terminated. The juvenile court also expressed concern that the motion to transfer custody was not made by anyone representing the Adoptive Parents. The juvenile court again explained that it could consider any competing adoption petitions at a post-termination review or at a pre-adoption hearing. The juvenile court stated,

> It would be my intent in this case that if, in fact—and that's not a sure thing—that Mother's parental rights were terminated, that I take a careful look, whether it's in an adoption proceeding or in another proceeding, at . . . what is in the best interest of these [C]hildren with regard to their future.

¶16    However, in response to Mother's request that it issue a ruling to establish a record for appeal, the juvenile court determined that it would not be in the Children's best interests to separate them from the Foster Parents because it would be psychologically and emotionally damaging. It further found that it was essential to maintain the nurturing relationship between the Children and the Foster Parents. The juvenile court also noted that there was no evidence to suggest a sibling bond existed between the Children and their older siblings. Thus, the juvenile court concluded that it was in the Children's best interests for them to

remain in the Foster Parents' home, even if such a placement prevented contact with Mother in the future.

¶17    The termination trial then continued with Mother's testimony. Mother indicated that it was important to her that the Children have a relationship with their older siblings and that she felt that the Adoptive Parents, unlike the Foster Parents, would allow her to continue to have a relationship with the Children. She noted, however, that while the Adoptive Parents had given her photos and information about the older children, she has had no actual contact with them since the voluntary relinquishment of her parental rights on September 19, 2006.

¶18    Mother's therapist also testified, indicating that Mother had made some progress in managing her depression and improving her organizational skills and that termination of her parental rights would be a "loss" for the Children. He also stated that the best option for the Children would be to put them in an adoptive placement where they could still have contact with Mother.

¶19    At the conclusion of evidence and arguments, the juvenile court announced its decision to order termination based, in part, on Dr. Featherstone's testimony and his Assessment. In its written termination order, the juvenile court explained that Mother continued to expose the Children to domestic violence, despite the loss of her older children due to similar issues, which had resulted in DCFS twice removing the Children from the home. The juvenile court further explained that although Mother was provided an opportunity to demonstrate that she was able to provide a safe and stable home, she had failed to solve her problems with homelessness and had lied about attending her domestic violence classes. As a result, the juvenile court terminated Mother's parental rights. Additionally, the juvenile court found that the Children had "become integrated into the [Foster Parents'] family to the extent that their familial identity is with that family" and that the Foster Parents are "able and willing permanently to treat the [C]hildren as members of the family." The juvenile court concluded that, "[i]n

consideration of the best interests of the [C]hildren," they should be "placed in the permanent care, custody, and control of DCFS for placement for adoption." Mother now appeals.

## ISSUES AND STANDARDS OF REVIEW

¶20 First, Mother argues that the juvenile court's decision not to place the children with the Adoptive Parents violated Mother's constitutional right to "due process regarding her residual parental rights." "Constitutional issues, including questions regarding due process, are questions of law that we review for correctness." *In re Adoption of I.K.*, 2009 UT 70, ¶ 7, 220 P.3d 464 (citation and internal quotation marks omitted).

¶21 Mother also challenges the sufficiency of the evidence supporting the juvenile court's conclusion that termination would be in the Children's best interests. "Whether a parent's rights should be terminated presents a mixed question of law and fact." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435. "[W]e will review the juvenile court's determination for clear error, reversing only if the result is 'against the clear weight of the evidence or leave[s] the appellate court with a firm and definite conviction that a mistake has been made.'" *In re A.K.*, 2012 UT App 232, ¶ 14, 285 P.3d 772 (second alteration in original) (quoting *In re B.R.*, 2007 UT 82, ¶ 12); *see also* Utah R. Civ. P. 52(a). In reviewing a juvenile court's order, this court "will not disturb the juvenile court's findings and conclusions unless the evidence clearly preponderates against the findings as made or the court has abused its discretion." *In re R.A.J.*, 1999 UT App 329, ¶ 6, 991 P.2d 1118 (citation and internal quotation marks omitted). "Additionally, we give the juvenile court a 'wide latitude of discretion as to the judgments arrived at based upon not only the court's opportunity to judge credibility firsthand, but also based on the juvenile court [judges'] special training, experience and interest in this field.'" *In re J.D.*, 2011 UT App 184, ¶ 9, 257 P.3d 1062 (quoting *In re E.R.*, 2001 UT App 66, ¶ 11, 21 P.3d 680).

ANALYSIS

I. Mother's Due Process Claims Are Unpreserved.

¶22    Mother first argues that the juvenile court's decision not to place the Children with the Adoptive Parents denied her "due process regarding her residual parental rights." The State argues that this claim is unpreserved because Mother failed to raise any issues implicating due process before the juvenile court. We agree.

¶23    "As a general rule, claims not raised before the trial court may not be raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346. Furthermore, "[t]he issue must be raised to a level of consciousness that allows the trial court an adequate opportunity to address it." *State v. Worwood*, 2007 UT 47, ¶ 16, 164 P.3d 397 (citation and internal quotation marks omitted). "[T]he preservation rule applies to every claim, including constitutional questions . . . ." *Holgate*, 2000 UT 74, ¶ 11. "When a party raises an issue on appeal without having properly preserved the issue below, we require that the party articulate an appropriate justification for appellate review; specifically, the party must argue either plain error or exceptional circumstance[s]." *State v. Winfield*, 2006 UT 4, ¶ 14, 128 P.3d 1171 (citation and internal quotation marks omitted). Because Mother did not raise her constitutional claims in the juvenile court or argue plain error or exceptional circumstances in her opening brief on appeal, we decline to reach the merits of her due process claim. *See O'Dea v. Olea*, 2009 UT 46, ¶¶ 18–19, 217 P.3d 704 ("The presence of a constitutional issue does not excuse [Mother] from complying with the preservation rules set by this court and the Utah Rules of Appellate Procedure."); *Coleman ex rel. Schefski v. Stevens*, 2000 UT 98, ¶ 9, 17 P.3d 1122 (declining to address plain error arguments raised for the first time in the reply brief).

II. Termination Is in the Best Interests of the Children.

¶24    Mother next argues that the juvenile court's best interest analysis was based on insufficient evidence. "In order to terminate parental rights, the juvenile court must make two separate findings. First, it must find grounds for termination under Utah Code section 78A-6-507. . . . Second, the juvenile court must find that termination of the parent's rights is in the best interests of the child." *In re A.C.M.*, 2009 UT 30, ¶ 23, 221 P.3d 185 (citation omitted); *see also* Utah Code Ann. §§ 78A-6-503(12), -506(3) (LexisNexis 2012); *In re J.D.*, 2011 UT App 184, ¶ 10. Here, the juvenile court determined that both prongs of the termination analysis had been proved by the evidence introduced at the termination trial. Mother does not dispute the juvenile court's finding that there are grounds for termination of her parental rights under Utah Code section 78A-6-507. *See generally* Utah Code Ann. § 78A-6-507 (LexisNexis 2012). Instead, Mother argues that the evidence was insufficient to support the juvenile court's ruling that termination is in the best interests of the Children. In particular, Mother claims that Dr. Featherstone's testimony and Assessment were insufficient to support termination and that DCFS and the juvenile court failed to consider preferential sibling placement under Utah Code sections 78A-6-312(19) and 78A-6-510.

¶25    Before we proceed with our analysis, we note that whether Foster Parents or Adoptive Parents should be permitted to adopt the Children is not at issue here. The question before us is whether the juvenile court clearly erred or exceeded its discretion in determining that it was in the Children's best interests to terminate Mother's parental rights.

¶26    In determining whether termination of a parent's rights is in the best interest of a child, the juvenile court must, at a minimum, consider "the physical, mental, or emotional condition and needs of the child . . . ," as well as "the effort the parent or parents have made to adjust their circumstances, conduct, or

conditions to make it in the child's best interest to return him to his home after a reasonable length of time."

*In re D.R.A.*, 2011 UT App 397, ¶ 10, 266 P.3d 844 (quoting Utah Code Ann. § 78A-6-509(1) (2008) (current version at *id*. (LexisNexis 2012))). Although Utah Code section 78A-6-509 sets forth certain factors that the juvenile court must consider, it "is not limited to" those factors in determining whether the parental rights of a parent who is not in physical custody of a child should be terminated. *See* Utah Code Ann. § 78A-6-509(1). Furthermore, while "evidence of unfitness may be probative of both factors of the termination analysis," "the best interest analysis includes consideration of the impact of termination on the child, rather than simply on evaluating whether the statutory grounds for termination have been met." *In re J.D.*, 2011 UT App 184, ¶ 12, 257 P.3d 1062.

¶27    Section 78A-6-510 sets forth specific considerations for the juvenile court "[i]f a child is in the custody of [DCFS] and has been placed and resides in a foster home and [DCFS] institutes proceedings . . . regarding the child, with an ultimate goal of having the child's foster . . . parents adopt him . . . ." Utah Code Ann. § 78A-6-510 (LexisNexis 2012). These factors include "whether the child has become integrated into the foster family to the extent that his familial identity is with that family, and whether the foster family is able and willing permanently to treat the child as a member of the family." *Id*. Section 78A-6-510 also requires the juvenile court to consider additional factors, which include, but are not limited to,

> (1) the love, affection, and other emotional ties existing between the child and the parents, and the child's ties with the foster family;
>
> (2) the capacity and disposition of the child's parents from whom the child was removed *as compared with* that of the foster family to give the child love,

affection, and guidance and to continue the education of the child;

(3) the length of time the child has lived in a stable, satisfactory foster home and the desirability of his continuing to live in that environment;

(4) *the permanence as a family unit of the foster family*; and

(5) any other factor considered by the court to be relevant to a particular placement of a child.

*Id*. (emphases added).

¶28    Mother argues that the evidence was insufficient on these factors. In particular, she claims that "[Dr.] Featherstone's testimony did not give a full, clear picture of the situation" because he observed Mother for only two-and-a-half hours. However, Dr. Featherstone did not rely solely on his observations of Mother. He also interviewed the Caseworker and the Foster Parents, reviewed Mother's extensive DCFS file, and observed the Children with the Foster Parents. The juvenile court also considered Mother's involved history with DCFS, her failure to remedy the issues that caused the Children to be removed from her custody, and the testimony of Mother, the Caseworker, Foster Mother, and Adoptive Mother during the termination trial. Based on all of the evidence, the juvenile court determined that separating the Children from the Foster Parents would be psychologically and emotionally damaging, while separating the Children from Mother would create little, if any, psychological damage. The juvenile court also found that the Children had become integrated into the foster family "to the extent that their familial identity is with that family" and that the Foster Parents were "able and willing permanently to treat the children as members of the family." After considering the factors outlined in sections 78A-6-509 and 78A-6-510, the juvenile court concluded that the Children did not have a significant bond

with Mother, but that they did have a significant bond with the Foster Parents. Because of the juvenile court's unique expertise in this area and its advantaged position to weigh the evidence, we defer to the juvenile court absent clear error or an abuse of discretion. *See T.C. v. Department of Human Servs.*, 2008 UT App 324U, para. 6 (mem.); *In re R.A.J.*, 1999 UT App 329, ¶ 6, 991 P.2d 1118. Mother has failed to convince us that either is present. *See In re J.D.*, 2011 UT App 184, ¶ 29 ("Where [t]he [juvenile] judge has applied his best judgment to the matter, and [i]t falls exclusively on the judge to decide whether or not the evidence presented rises to the level of clear and convincing proof, we cannot conclude that [the juvenile court's] finding that termination of Mother's parental rights is in the best interest of the Children is clearly erroneous." (first, second, and third alteration in original) (citation and internal quotation marks omitted)).

¶29 Nevertheless, Mother argues that the best interests determination is erroneous because DCFS and the juvenile court failed to investigate placing the Children with their older siblings as required by Utah Code section 78A-6-312(19). *See* Utah Code Ann. § 78A-6-312(19) (LexisNexis 2012) ("When a court conducts a permanency hearing for a minor . . . , the court shall attempt to keep the minor's sibling group together if keeping the sibling group together is: (a) practicable; and (b) in accordance with the best interest of the minor."). Mother also contends that the best interests analysis is erroneous because the juvenile court failed to apply the permanency considerations of section 78A-6-312(19) when it considered the bond between the Children and the Foster Parents for purposes of the 78A-6-510 factors. *See id.* § 78A-6-510 (describing specific factors the juvenile court should consider during a termination proceeding where a child has been placed in a foster home). Mother claims that the two statutes must be read harmoniously and that the preferences must first be determined at permanency hearings prior to a consideration of best interests at termination.

¶30     As previously indicated, the question of whether Foster Parents or Adoptive Parents should be permitted to adopt the Children is not at issue in this appeal. Furthermore, at the permanency hearing that occurred four months before the termination trial, Mother raised no concerns about the placement with Foster Parents rather than Adoptive Parents. At this phase of the proceedings, the narrow issue before the juvenile court was whether Mother's rights should be terminated, not who should be permitted to adopt the Children.

¶31     To the extent the sibling placement issue has any relevance to these proceedings, it is limited to the weight the juvenile court should give the strength of the bond between Foster Parents and the Children. While section 78A-6-510(2) instructs the juvenile court to consider the capacity of Mother to "give the child love, affection, and guidance," "as compared with" the Foster Parents' capacity, an assessment that the Foster Parents are better able to do so may be less probative of best interest if the placement with Foster Parents must be terminated for legal reasons. *See id.* § 78A-6-510(2). Therefore, we address whether it was reasonable for the juvenile court to consider whether the risk that the Children would be required to be placed with Adoptive Parents was significant. *See id.* § 78A-6-510(4)–(5) (requiring the juvenile court to consider "the permanence as a family unit of the foster family" or "any other factor considered . . . relevant to a particular placement of [the Children]" in a decision to terminate Mother's parental rights). We are convinced that the juvenile court did not exceed its discretion in considering the Children's bond with Foster Parents in its best interests determination.

¶32     First, the Adoptive Parents have not filed any motion seeking custody of the Children.[1] Additionally, DCFS made two

---

1. The State and the Guardian ad Litem challenge Mother's standing to seek custody on behalf of a third party. We need not

(continued...)

attempts to place the Children with the Adoptive Parents, but they were either unwilling or unlicensed. As a result, DCFS had to make other arrangements. The Foster Parents have now assumed the primary parenting role, and the Children have formed critical attachments with them. Indeed, by Adoptive Mother's own account, she did not contact DCFS about the Children until March 2012, after the Children had been with the Foster Parents for nine months.

¶33    We also reject Mother's assertion that the juvenile court should not have considered the bond between the Children and the Foster Parents because sibling placement in section 78A-6-312(19) requires the Children to be placed with their older siblings. *See id.* § 78A-6-312(19). When interpreting statutory provisions, "we first look to the plain language of the statute." *State v. Germonto*, 2003 UT App 217, ¶ 7, 73 P.3d 978. Additionally, "[w]hen interpreting a statute, we assume, absent a contrary indication, that the legislature used each term advisedly according to its ordinary and usually accepted meaning." *Hutter v. Dig-It, Inc.*, 2009 UT 69, ¶ 32, 219 P.3d 918. When the plain language is clear, no other interpretive tools are needed because our inquiry is complete. *See C.T. ex rel. Taylor v. Johnson*, 1999 UT 35, ¶ 13, 977 P.2d 479 ("[I]t is elementary that we do not seek guidance from legislative history and relevant policy considerations when the statute is clear and unambiguous."). Although the Utah Code does not define what constitutes a "sibling group," the use of the term "group," rather than just "sibling," suggests an affiliation based on more than genetics. *See Merriam-Webster*, http://www.merriam-webster.com/dictionary/group (last visited May 10, 2013) (defining "group" as "two or more figures forming a complete unit in a composition" and "a number of individuals

---

1. (...continued)
reach this issue, however, because the question of whether Foster Parents or Adoptive Parents should be permitted to adopt the Children is not at issue in this appeal.

assembled together or having some unifying relationship”); *cf. In re Adoption of B.C.S.*, 793 N.E.2d 1054, 1062 (Ind. Ct. App. 2003) (refusing to reverse trial court’s decision denying a grandaunt and granduncle’s petition to adopt, even though the grandaunt and granduncle had custody of the child’s sibling, where the siblings were not considered “a typical ‘sibling group’” under the state’s sibling placement preference statute because “[t]hey interacted once before the death of their mother . . . [and] they are not children who grew up in the same household for a number of years”); *In re C.L.H.*, No. 244877, 2003 WL 21278916, at *2–4 (Mich. Ct. App. June 3, 2003) (per curiam) (reversing a trial court’s denial of consent for the foster parents to adopt a child where the decision was based upon the child’s blood relationship with another prospective adoptive parent who had earlier adopted the child’s half siblings, noting that “the child had no emotional connection to her siblings; thus, there [was] no sibling relationship or shared family history to weigh against the benefit of maintaining continuity of her placement with [the foster parents]”); *In re Meridian H.*, 798 N.W.2d 96, 99, 107 (Neb. 2011) (holding that no constitutionally protected sibling relationship exists between children whose parent’s parental rights were terminated and their later-born sibling); *In re Wesley R.*, 2002 N.Y. Slip Op. 40506(v), 2002 WL 31890764, at *6 (N.Y. Fam. Ct. Dec. 13, 2002) (holding that the rule implying that siblings should be kept together is “predicated not upon biological relationships, but upon familial relationships”).

¶34    Furthermore, section 78A-6-312(19) permits a placement by its plain terms that separates a “sibling group” when it is not “practicable” or it is not “in accordance with the best interest of the minor.” *See* Utah Code Ann. § 78A-6-312(19). Here, on the two occasions when DCFS had to find a foster placement for the Children, it was impracticable to place them with Adoptive Parents because they first declined the Children and on the second occasion they were not licensed to receive them. Furthermore, the Children have no bond with their older siblings because before the Children were born, DCFS removed the older siblings, Mother voluntarily relinquished her parental rights to them, and they were adopted by

the Adoptive Parents. Indeed, the record is unclear whether the Children have ever met their older siblings. And Dr. Featherstone opined that it may be problematic for the Children to visit with their older siblings. Accordingly, the juvenile court could properly conclude that it was in the Children's best interests to place them with the Foster Parents rather than with the Adoptive Parents and the older children.

CONCLUSION

¶35     For all of these reasons, we conclude that the juvenile court did not exceed its discretion in considering the bond between the Children and the Foster Parents in assessing the best interests of the Children. Likewise, the juvenile court's ruling that it is in the Children's best interests to terminate Mother's parental rights is supported by the evidence and within the juvenile court's discretion.

¶36     Affirmed.

———————